439 A.2d 683

**William R. GORDON**

v.

**Rosemarie A. Feeney GORDON, Appellant.**

Superior Court of Pennsylvania.

Argued April 23, 1981.

Filed Dec. 18, 1981.

494

496

William A. George, Media, for appellant.

Stanley M. Shingles, Philadelphia, for appellee.

Before CERCONE, President Judge, and PRICE, SPAETH, HESTER, CAVANAUGH, WICKERSHAM, BROSKY, DiSALLE, JOHNSON, MONTEMURO, POPO-VICH, SHERTZ and WIEAND, JJ.

SPAETH, Judge:

This is a divorce action. The action was commenced under the Divorce Law of 1929,[1] and was pending on July 1, 1980, when the Divorce Code of 1980[2] became effective. Section 103 of the Divorce Code provides that "upon application granted," a pending action shall proceed under the Divorce Code instead of under the Divorce Law. Appellant, as the wife-defendant, filed an application that this action proceed under the Divorce Code. The reason she filed the application was to take advantage of provisions of the Divorce Code that direct equitable distribution of marital property and, in certain circumstances, payment of alimony after divorce. The Divorce Law has no such provisions, so that if the action were to proceed under it, and appellant were divorced from her husband, she would be entitled only to her share of property that had been held by the entireties and would not be entitled in any circumstances to alimony. The lower court denied the application, and the principal issue on this appeal is whether that was error. We hold that when the application was presented, the lower court should have asked whether granting it would further "the policy of the Commonwealth" as declared by the legislature when it enacted the Divorce Code. 23 P.S. § 102. As applied to the facts of

1. The Divorce Law, Act of May 2, 1929, P.L. 1237, as amended, 23 P.S. § 1 et seq. (repealed).

2. The Divorce Code, Act of April 2, 1980, P.L. 63, Act No. 26, 23 P.S. § 101 et seq.

this case, that means that the lower court should have asked whether granting the application would "deal[ ] with the realities of matrimonial experience," 23 P.S. § 102(a)(1), "[m]itigate the harm to the spouses," 23 P.S. § 102(a)(4), and "[e]ffectuate economic justice," 23 P.S. § 102(a)(6). It is clear that granting the application would further these objectives. Accordingly, in denying the application the lower court committed error. We therefore reverse and remand with instructions that the action proceed under the Divorce Code.

## I

Before we may reach the principal issue, as we have just defined it, we must clear away a good deal of procedural underbrush.

Appellee, the husband-plaintiff below, commenced this action by filing a complaint in divorce a.v.m. on January 2, 1979, charging appellant, his wife, with indignities. Appellant contested the action, and nine hearings were held before a master. On April 2, 1980, the master filed his report, recommending that appellee be granted a divorce. Meanwhile, on March 25, 1980, the legislature had enacted the Divorce Code. On April 2, 1980, the Governor signed the Divorce Code, to become effective on July 1, 1980. On July 7, 1980, appellant filed an application that the action proceed under the Divorce Code. On July 29, 1980, the lower court entered an order denying the application. Appellant appealed to this court at Number 1902 Philadelphia 1980. On September 4, 1980, the lower court entered a decree granting appellee a divorce on the ground of indignities. Appellant appealed to this court at Number 2150 Philadelphia 1980. On February 6, 1981, the two appeals were consolidated. Meanwhile, on September 3, 1980, appellee had filed a motion to quash Appeal Number 1902, from the order denying appellant's application, claiming that the order was an unappealable interlocutory order. On February 20, 1981, we denied the motion to quash, without prejudice, however, to the parties' rights to brief and argue the question whether the order was immediately appealable.

## A

It will be convenient to consider first the status of Appeal Number 2150, from the decree granting appellee a divorce. As just stated, when the lower court entered the decree, appellant had already filed Appeal Number 1902, from the lower court's earlier order denying her application that the action proceed under the Divorce Code. This being so, the lower court had no jurisdiction to proceed further with the case. Pa.R.A.P. 1701. The court was therefore without power to enter the decree granting appellee a divorce. It is true that the court believed that its order denying appellant's application was an interlocutory order from which no appeal could be taken, and had filed an opinion to that effect. Even if correct, however, and as we shall see, it was not, this belief was irrelevant. This court has held that "[t]he fact that the appellate court ultimately quashes an appeal because it was improperly taken from an interlocutory order does not add strength or validity to an order entered while said appeal is pending. It is for the appellate court to determine the merits of the appeal, and not the lower court." *Weise v. Goldman*, 229 Pa.Superior Ct. 187, 323 A.2d 31 (1974). We must therefore vacate the decree granting appellee a divorce, and dismiss Appeal Number 2150 as moot.

## B

We may now consider the status of Appeal Number 1902, from the lower court's order denying appellant's application that the action proceed under the Divorce Code. While the answer to the question whether that order was immediately appealable is not self-evident, it is plain enough.

"Whether an order is final and appealable cannot necessarily be ascertained from the face of the decree alone, nor simply from the technical effect of the adjudication. The finality of an order is a judicial conclusion which can be reached only after an examination of its ramifications." [*Bell v. Beneficial Consumer Discount Company*, 465 Pa. 225, 228, 348 A.2d 734, 735 (1975)]. We have also said that

if the practical consequence of the order by the trial court is effectively to put an appellant "out of court" the order will be treated as final. *Ventura v. Skylark Motel, Inc.,* 431 Pa. 459, 463, 246 A.2d 353, 355 (1968). Similarly, an order is "final" if it precludes a party from presenting the merits of his claim to the lower court. *Marino Estate,* 440 Pa. 492, 494, 269 A.2d 645, 646 (1970).

*Pugar v. Greco,* 483 Pa. 68, 74, 394 A.2d 542, 545 (1978).

■ Stated generally, the policy underlying the principle that an order is not appealable unless it puts the appellant "out of court" is that piecemeal litigation should be avoided; the appellate courts will use their resources more economically if they review a case only once, rather than deciding one issue on one appeal, and another issue on a later appeal. Thus where the trial court on preliminary objections has dismissed one or more counts of a multi-count complaint, but has not dismissed the entire complaint, we have held that the court's order was interlocutory and not appealable. *E.g., Bagshaw v. Vickers,* 286 Pa.Superior Ct. 246, 428 A.2d 664 (1981); *Giannini v. Foy,* 279 Pa.Superior Ct. 553, 421 A.2d 338 (1980).

■ However, the phrase "out of court" must not be interpreted literally; it is not synonymous with "final." In *Commonwealth v. Orsatti,* 448 Pa. 72, 75–76, 292 A.2d 313, 315 (1972), the Supreme Court in refusing to quash an appeal, said: "[W]e do not mean to suggest that a final judgment on the original issue raised by the complaint could not have been awaited by the defendants or that, upon appealing from such final judgment, the action of the court below, .... could not then have been assigned for error. But, obviously, such a course would not have afforded expeditious procedure for the ultimate disposition of the entire controversy," *quoting Broido v. Kinneman,* 375 Pa. 568, 569, 101 A.2d 647, 648 (1954). *See also, Posternack v. American Casualty Co.,* 421 Pa. 21, 218 A.2d 350 (1966); *Pellegrine v. Home Ins. Co.,* 200 Pa.Superior Ct. 48, 186 A.2d 662 (1962). It is therefore plain that in deciding whether an order is "final," one must do more than ask only whether the

appellant is "out of court;" one must also ask whether, even if the appellant is still in court, the order is in its "practical aspects," *Bell v. Beneficial Consumer Discount, supra,* sufficiently final to make it appealable. These considerations explain the rule that "an order is 'final' if it precludes a party from presenting the merits of his claim to the lower court." *Pugar v. Greco, supra* 483 Pa. at 74, 394 A.2d at 545.

A helpful illustration of this rule may be found in *T.C.R. Realty, Inc. v. Cox,* 472 Pa. 331, 372 A.2d 721 (1977). There the appeal was from an order dismissing the appellant's complaint. The Supreme Court acknowledged that in a literal sense, the appellant was not "out of court," for the appellees had filed a counterclaim that remained to be tried. The Court nevertheless held that the lower court's order was appealable, for its "practical ramification . . . [was] to completely deprive the litigant of his day in court so far as his claim is concerned." 472 Pa. at ·337, 372 A.2d at 724.

In the present case, appellant is in essentially the same position as were the appellants in *T.C.R. Realty, Inc. v. Cox, supra; Commonwealth v. Orsatti, supra,* and *Broido v. Kinneman, supra.* If the action is to proceed under the Divorce Law, as appellee asserts it should, appellant is limited to defending on the merits; she may claim that appellee has not proved that she was at fault and that he is an innocent and injured spouse. 23 P.S. § 10. If, however, the action is to proceed under the Divorce Code, appellant may assert claims of her own, specifically, to an equitable distribution of marital property, 23 P.S. § 401(d), and to alimony after divorce, 23 P.S. § 501. Appellant's right to an equitable distribution of marital property would be absolute, that is, unaffected by a finding on the merits that she was at fault and that appellee is innocent and injured and therefore entitled to a divorce. 23 P.S. § 401(d). With regard to appellant's right of alimony, any marital misconduct on her part would be only one of fourteen factors to be considered by the court. 23 P.S. § 501(b). The lower court's order denying appellant's application that the action proceed under the Divorce Code did not put appellant com-

pletely out of court, for she remains in court to defend appellee's claim to a divorce under the Divorce Law. However, so far as appellant's *own* claims under the Divorce Code are concerned, the order did put appellant completely out of court, for it "completely deprive[d] [her] or [her] day in court" on those claims. *T.C.R. Realty, Inc. v. Cox, supra,* 472 Pa. at 337, 372 A.2d at 724. We therefore hold that the lower court's order denying appellant's application that the action proceed under the Divorce Code was appealable.

■ We may add that the correctness of this conclusion is confirmed by a consideration of the practical aspects of the order. It would of course be possible to say that decision on the correctness of an order denying an application that an action proceed under the Divorce Code should await decision on the merits of the divorce decree; if it were decided that the decree should be affirmed, but that the application should have been granted, the case could be remanded for the limited purpose of awarding equitable distribution of marital property and, depending on the circumstances, alimony. As a practical matter, however, such delayed relief might do irreparable harm. Divorce litigation is notably bitter, and many an appellant would find, upon remand, that the marital property had been dissipated, with the result that her rights on remand (or his) were of little value. As we have seen, for an order to be appealable the possibility of irreparable harm need not be shown, so long as the order "completely deprives" the appellant of the ability to present his claim. *T.C.R. Realty, Inc. v. Cox, supra.* However, when to such deprivation the possibility of irreparable harm is added, the conclusion that the order is appealable is particularly compelling.

## II

Having held it appealable, we may now consider the correctness of the lower court's order denying appellant's application that the action proceed under the Divorce Code

of 1980, instead of the Divorce Law of 1929. Stated generally, the question we must answer is, How should a court decide whether to grant such an application? It has been suggested that the legislature has prescribed no standards, and that because of that failure, the answer to this question is obscure. To the contrary, however, as we shall see, the legislature *has* prescribed standards, which are stated in the most vigorous and forthright manner. In a rare case, perhaps, a court may experience some difficulty in deciding whether to grant an application. In most cases, the decision should be easy.

### A

Section 103—the section of the Divorce Code in question—provides as follows:

> The provisions of this act, so far as they are the same as those of existing laws, are intended as a continuation of such laws and not as new enactments. The provisions of this act shall apply to all cases, whether the cause for divorce or annulment arose prior or subsequent to enactment of this act. The provisions of this act shall not affect any suit or action pending, but the same may be proceeded with and concluded either under the laws in existence when such suit or action was instituted, notwithstanding the repeal of such laws by this act, or, upon application granted, under the provisions of this act. The provisions of this act shall not apply to any case in which a decree has been rendered prior to the effective date of the act. This act shall not affect any marital agreement executed prior to the effective date of this act or any amendment or modification thereto.

The record of the legislative debate that preceded adoption of the Divorce Code includes no discussion of the phrase "upon application granted." This is not surprising, for section 103 was taken almost verbatim from section 104 of the Proposed Divorce Code drafted by the Joint State

Government Commission in 1961 and published by the Commission at that time.[3] Section 104 of the Proposed Divorce Code of 1961 was in turn taken almost verbatim from section 67 of the Divorce Law of 1929.[4]

**3.** The Proposed Divorce Code is reprinted with the official comments of the Joint State Government Commission in Perlberger, Pennsylvania Divorce Code, Appendix A at 20 (1980).

**4.** Section 67 of the Divorce Law, section 104 of the Proposed Divorce Code of 1961, and section 103 of the Divorce Code of 1980 are reprinted below. For convenience in making comparisons, the portions of all three sections that are identical are printed in ordinary type, with the variations emphasized.

The provisions of this act, so far as they are the same as those of existing laws, are intended as a continuation of such laws and not as new enactments. The provisions of this act shall apply to all cases, whether the cause for divorce arose prior or subsequent to the *passage* of this act. The provisions of this act shall not affect any suit or action pending, but the same *shall and* may be proceeded with and concluded under the laws in existence when such suit or action was instituted, notwithstanding the repeal of such laws by this act, or *may be proceeded with and concluded* under the provisions of this act.

Act of May 2, 1929, P.L. 1237, § 67—The provisions of this act, so far as they are the same as those of existing laws, are intended as a continuation of such laws and not as new enactments. The provisions of this act shall apply to all cases, whether the cause for divorce *or annulment* arose prior or subsequent to the *passage* of this act. The provisions of this act shall not affect any suit or action pending, but the same may be proceeded with and concluded either under the laws in existence when such suit or action was instituted, notwithstanding the repeal of such laws by this act, or, *upon application granted,* under the provisions of this act.

Divorce Code proposed in 1961 by the Joint State Government Commission, § 104.

The provisions of this act, so far as they are the same as those of existing laws, are intended as a continuation of such laws and not as new enactments. The provisions of this act shall apply to all cases, whether the cause for divorce *or annulment* arose prior or subsequent to *enactment* of this act. The provisions of this act shall not affect any suit or action pending, but the same may be proceeded with and concluded *either* under the laws in existence when such suit or action was instituted, notwithstanding the repeal of such laws by this act, or, *upon application granted,* under the provisions of this act. *The provisions of this act shall not apply to any case in which a decree has been rendered prior to the effective date of the act. This act shall not affect any marital agreement executed prior to the effective date of this act or any amendment or modification thereto.*

Act of April 2, 1980, P.L. 63, No. 26, § 103.

Section 67 provided that pending actions "shall and may be proceeded with and concluded under the [prior] law[ ] . . . or may be proceeded with and concluded under the provisions of this act." The Divorce Law of 1929 was intended primarily as a restatement and codification of existing law. Teitelbaum, "The Pennsylvania Divorce Law," 23 P.S. at 343, 346. Generally speaking, therefore, it was unimportant under which law a pending action proceeded.

The Proposed Divorce Code of 1961 contemplated significant changes in the divorce law, although not as significant as those ultimately made by the Divorce Code of 1980. In particular, the Proposed Divorce Code of 1961 provided for divorce after "[l]iving apart for a continuous period of two years because of estrangement due to marital difficulties," § 301(1)(c), and for alimony, § 504. Given changes of this significance, it was necessary to make clear whether the old law or the new law would apply to a pending action. Thus, while the official comment to section 104 of the Proposed Divorce Code of 1961 explained that section 104 was "based on Section 67 of the 1929 Act (23 P.S. § 67)," section 104 was altered to provide that a pending action would proceed under the old law unless, "upon application granted," the new law was made applicable.

Section 102 of the Proposed Divorce Code of 1961 contained a declaration of "the policy of the Commonwealth of Pennsylvania." The declaration described the objectives sought to be achieved by the Code, and concluded with the provision that these objectives "shall be considered in construing any provisions of this act and shall be regarded as expressing the legislative intent." The official comment to section 102 of the Proposed Divorce Code of 1961 reads: "The provisions of this section are new and are intended to apply to the entire code, *including provisions of Section 104 relating to 'Pending Proceedings.'* " (Emphasis added.) It is therefore plain beyond misunderstanding that under the Proposed Divorce Code of 1961, the decision whether an "application [should be] granted" was to be made by reference to the objectives described in section 102 of the Code.

If granting the application would further those objectives, the court should grant the application; if granting the application would be inconsistent with those objectives, the court should deny the application.

■ Exactly the same statutory structure is repeated in the Code of 1980. Section 102 of the Divorce Code of 1980 contains a declaration of "the policy of the Commonwealth of Pennsylvania." The declaration describes the objectives sought to be achieved by the Code. These objectives are closely modeled on those described in section 102 of the Proposed Divorce Code of 1961; indeed, many of the same phrases are repeated.[5] Finally, section 102 of the Divorce

5. For easy comparison section 102 of the Proposed Divorce Code of 1961 and section 102 of the Divorce Code of 1980 are reprinted below:

—Whereas the family is the basic unit in society and the protection and preservation of the family is of paramount public concern, it is hereby declared to be the policy of the Commonwealth of Pennsylvania:
1. To encourage and effect a reconciliation and settlement of differences between spouses, especially where minor children are involved;
2. To give primary consideration to the welfare of the family rather than to the vindication of private rights or to the punishment of matrimonial wrongs;
3. To seek the causes rather than the symptoms of family disintegration and to cooperate with and utilize the services of these resources which are available to deal with family problems;
4. To effectuate economic justice between parties who are divorced or separated and to grant or withhold alimony or allowances according to the actual need and ability to pay of the parties and to insure a fair and just determination and settlement of their property rights;
5. To eliminate the fragmentation of remedies dealing with family disorganization and to consolidate in one action the cause for divorce, the determination of custody and support of children and the settlement of property rights between husband and wife and the right, if any, to alimony or allowance.
The objectives above set forth shall be considered in construing any provisions of this act and shall be regarded as expressing the legislative intent.
Divorce Code proposed in 1961 by the Joint State Government Commission, § 102.
(a) The family is the basic unit in society and the protection and preservation of the family is of paramount public concern. Therefore, it is hereby declared to be the policy of the Commonwealth of Pennsylvania to:

Code of 1980 concludes with a provision, copied almost verbatim from section 102 of the Proposed Divorce Code of 1961, that the objectives described in the declaration of policy "shall be considered in construing provisions of this act and shall be regarded as expressing the legislative intent." It is therefore just as plain under the Divorce Code of 1980 as it was under the Proposed Divorce Code of 1961 that the decision whether an "application [should be] granted" is to be made by reference to the objectives described in section 102 of the Code. If granting the application will further those objectives, the court should grant the application; if granting the application will be inconsistent with those objectives, the court should deny the application.

### B

▉ Reference to the objectives described in section 102 of the Divorce Code will in most cases make it easy for a court to decide whether to grant an application that a pending action proceed under the Code.[6] The point to bear in mind is

(1) Make the law for legal dissolution of marriage effective for dealing with the realities of matrimonial experience.

(2) Encourage and effect reconciliation and settlement of differences between spouses, especially where children are involved.

(3) Give primary consideration to the welfare of the family rather than the vindication of private rights or the punishment of matrimonial wrongs.

(4) Mitigate the harm to the spouses and their children caused by the legal dissolution of the marriage.

(5) Seek causes rather than symptoms of family disintegration and cooperate with and utilize the resources available to deal with family problems.

(6) Effectuate economic justice between parties who are divorced or separated and grant or withhold alimony according to the actual need and ability to pay of the parties and insure a fair and just determination and settlement of their property rights.

(b) The objectives set forth in subsection (a) shall be considered in construing provisions of this act and shall be regarded as expressing the legislative intent.

Act of April 2, 1980, P.L. 63, No. 26, § 102.

6. The court should, however, ensure that a party opposed to transfer has the opportunity to raise objections. This does not mean that there must always be a formal evidentiary hearing prior to any court action. In the present case, when the lower court ruled on appellant's application it had before it a stipulation as to what the testimo-

that the Divorce Code of 1980 represents a drastic, and dramatic, repudiation by the legislature of the philosophy of the Divorce Law of 1929.

With only very minor exceptions, the Divorce Law permitted a decree of divorce to be entered only upon proof of fault. Divorce was thus regarded as a punishment, and consistent with this attitude, the Divorce Law contained no provisions for alimony after divorce or distribution of separately titled property. A prevailing plaintiff, having won an adversary litigation, had no duty to provide economically for the defendant who had just been found to have been at fault. *Hooks v. Hooks*, 123 Pa. Superior Ct. 507, 513, 187 A. 245, 247 (1936).

The consequences of this legislative scheme were most regrettable. For example: A couple might want a divorce because their marriage had irretrievably failed. They would be unable to get a divorce, however, either because neither could prove that the other was at fault in any of the senses that fault was defined under the Divorce Law, or because neither was an "injured and innocent" spouse. If they could afford it, they would resort to another jurisdiction. More likely, they would resort to a court in Pennsylvania, obtaining a divorce on the basis of perjured testimony. Another example: A husband wanted a divorce, to marry another woman, but could not get it because he could not prove that his wife was at fault. Knowing that if he got a divorce he would not have to support her, and that he was not entitled to a divorce, his wife would not agree to a divorce until he made a property settlement, which she required be as large as possible ("If you want a divorce, you're going to have to pay for it"). The settlement made, she would stop contesting the divorce action, and a divorce would be obtained

ny would be if a hearing were held. Neither party has objected on appeal to this procedure, nor do we see any problem with it. We also see no problem with the procedure followed in Philadelphia County, where applications for transfer are routinely granted but a party opposing a transfer is permitted by means of a petition to strike the transfer to raise all the issues that could have been raised at an earlier hearing.

either in another jurisdiction or in Pennsylvania on the basis of perjured testimony. Another example: A wife was economically dependent on her husband. Whatever employable skills she once had were lost or obsolete because she had spent her time taking care of her husband and the household and having and raising children. Her husband demanded a divorce. If he obtained a divorce, she would be economically helpless; she would be entitled to no share of the property he had accumulated during their marriage and put in his name only. She therefore contested his action, in every possible way, and without reference to the merits of the case—as "merits" were defined under the Divorce Law—or the state of the marriage.

Examples could be multiplied but need not be. It is enough to observe that under the Divorce Law of 1929, dishonesty, greed, and cruelty were characteristic of divorce litigation, and great and unnecessary misery was inflicted, not simply on the parties, but often, on their children, who were drawn into the bitter and protracted struggles.

In enacting the Divorce Code of 1980, the legislature responded to these conditions in the most vigorous and forthright manner. In section 102 of the Divorce Code the legislature declared as the policy of the Commonwealth a philosophy and set of objectives diametrically opposed to the punitive philosophy of the Divorce Law of 1929. Thus the legislature expressed its intent that the new Code should "deal[ ] with the realities of matrimonial experience." 23 P.S. § 102(a)(1). It stated that "reconciliation and settlement" should be "[e]ncourage[d] and effect[ed]," "especially where children are involved." 23 P.S § 102(a)(2). It explicitly repudiated the philosophy that the basis of the law should be "the vindication of private rights or the punishment of matrimonial wrongs," stating that instead, "primary consideration" was to be given to "the welfare of the family." 23 P.S. § 102(a)(3). It expressed the desire that "the harm to the spouses and their children" should be "[m]itigate[d]," 23 P.S. § 102(a)(4), and that "causes rather than symptoms of family disintegration" should be sought,

23 P.S. § 102(a)(5). And finally, it emphasized its intent to "[e]ffectuate economic justice between parties who are divorced or separated." 23 P.S. § 102(a)(6). The legislature implemented this declaration of policy by enacting changes of the most fundamental nature. In particular, while retaining fault—based grounds for divorce, 23 P.S. § 201(a), the legislature provided: that a divorce could be obtained by consent of the parties, if they alleged that "the marriage is irretrievably broken and 90 days have lapsed from the date of filing the complaint," 23 P.S. § 201(c); that a divorce could be obtained "where . . . the parties have lived separate and apart for a period of at least three years, and . . . the marriage is irretrievably broken," 23 P.S. § 201(d); that "the court shall, upon request of either party, equitably divide, distribute or assign the marital property between the parties without regard to marital misconduct," 23 P.S. § 401(d); and that "[t]he court may allow alimony [after divorce], as it deems reasonable," 23 P.S. § 501(a), as determined in the light of fourteen factors, only one of which is marital misconduct, 23 P.S. § 501(b).

Accordingly, when a court asks whether granting an application that an action proceed under the Divorce Code will further, or be inconsistent with, the objectives the legislature intended to achieve by enacting the Code, in most cases the answer should be easy; for the legislature has stated its objectives, and the philosophy underlying them, with clarity.

## C

It may be useful at this point to indicate the extent to which we differ with the views expressed by our colleagues Judge SHERTZ and Judge POPOVICH, and to explain why we find ourselves unable to agree with them.

■ The requirement that the decision whether an "application [should be] granted" is to be made by reference to the objectives described in section 102 of the Divorce Code necessarily implies that the court must exercise some discretion. To this extent we are in agreement with Judge SHERTZ's dissent. In our view, however, the range of

discretion is extremely narrow, being limited to a consideration of whether granting the application will be consistent with the objectives described in section 102 of the Divorce Code. For a court to exercise the broad discretion called for by Judge SHERTZ would be to violate the legislative mandate expressed in section 102(b). To say, as Judge SHERTZ does, that in every case the court must consider factors other than the objectives described in section 102(a) is to say that even if granting the application would in every respect be consistent with every one of the objectives described in section 102, still, the court could properly deny the application on the ground that to do so would serve objectives that the court, in its discretion, considered more compelling than those expressed by the legislature. The result would be great inequity throughout the Commonwealth, with different lower courts denying or granting applications by standards more or less idiosyncratic. Indeed, as we shall see, that is precisely what happened in the present case, where the lower court denied the application with no reference to the objectives the legislature sought to accomplish when it enacted the Divorce Code.

Judge SHERTZ argues that the section 102 cannot provide the exclusive guide for the exercise of discretion in ruling on an application for transfer because of the possibility that in a given case some of the objectives might point toward granting the application while others pointed toward denial. Although this argument when stated in the abstract has a certain logical appeal, it does not acknowledge the way in which the six subsections of § 102(a) all express different aspects of a single, consistent philosophy on marriage and the family, which may be summarized as follows: The family is the basic unit in society and should be preserved and protected. However, when a marriage cannot be preserved, which is to say, when one or more of the grounds for divorce contained in § 201 exist, the dissolution should be accomplished in a manner that recognizes the prior existence of the family as both an economic and a social unit, and that emphasizes the future welfare of each member of the fami-

ly, instead of in a manner that identifies and punishes guilty parties. Given this consistency of philosophy, we have difficulty imagining a case in which as a practical matter the objectives described in section 102(a) would point in different directions.

Judge SHERTZ suggests that we are guilty of overstatement when we say that the Divorce Code of 1980 represents a repudiation by the legislature of the philosophy of the Divorce Law of 1929. In support of this suggestion he points to the fact that the Divorce Code retains the fault-based grounds for divorce, and does not require that an action pending under the Divorce Law be transferred to proceed under the Divorce Code. Dissenting opinion at 707. In our opinion, however, the retention in the Divorce Code of fault-based grounds for divorce is no more than the sort of legislative accommodation that typically accompanies the enactment of a major reform. The central fact is that under the Divorce Code the legislature provided for divorce by consent, alimony after divorce, and equitable distribution of marital property. To suggest that the provision of these in a state that had previously lacked all three does not represent a repudiation of prior law is, we submit, unrealistic.

Judge POPOVICH expresses the view that the Divorce Code calls for transfer *pro forma* upon application of either party. Certainly, if adopted this view would do no great injustice—perhaps none at all—for it is difficult to imagine a case in which granting an application would be inconsistent with the objectives described by the legislature when it enacted the Divorce Code. Most applications, it may be assumed, and perhaps all, will be filed in order to take advantage of the provisions of the Divorce Code that direct equitable distribution of marital property and, in certain circumstances, payment of alimony after divorce. Granting such applications will in most, if not all, cases be consistent with the objectives described by the legislature. Nevertheless, the phrase "upon application granted" implies that the application may be denied, in other words, that the court to

which the application is presented must decide *whether* to grant or deny the application. In Judge POPOVICH's view, the court would not have to make any decision, but would grant the application *"pro forma."* We believe this view does unnecessary violence to the legislative choice of language. In construing the statute, we should read its language in the light of common usage, and if possible "give effect to all its provisions." 1 Pa.C.S.A. § 1921(a); *Commonwealth v. Hill,* 481 Pa. 37, 391 A.2d 1303 (1978). We therefore conclude that the legislature contemplated the possibility that an application would be presented that would be inconsistent with the objectives of the Divorce Code, and that it intended that such an application should be denied. The fact that we find it difficult to describe the features of such an application does not persuade us to Judge POPOVICH's view. Litigation may take a quite unanticipated shape, and we think it wiser to leave open the possibility evidently contemplated by the legislature.

### D

We may now examine the opinion of the lower court. In explaining its order denying appellant's application that the action proceed under the Divorce Code, the lower court wrote: "There are no equitable considerations in favor of allowing [appellant] to proceed under the new code." Slip op. at 3. The court's opinion contains no acknowledgment of the fact that appellant could hardly be a better example of the kind of person the Code was enacted to protect. Appellant is in her middle forties, has been married for over twenty years, and has worked outside the home since her marriage only intermittently and in relatively low-skilled jobs. During her marriage she has made a home for her financially successful husband and their two children. The only property she would have any claim to under the Divorce Law of 1929 would be her share of the jointly owned residence; in her application she alleges that as her husband, appellee has accumulated during their marriage a substantial amount of property that is held in his name alone. In

these circumstances for the lower court to find no equitable considerations in appellant's favor was to ignore the standards prescribed in section 102 of the Divorce Code. Plainly, granting the application would further the objectives of the legislature to "deal[ ] with the realities of matrimonial experience," 23 P.S. § 102(a)(1), "[m]itigate the harm to the spouses and their children," 23 P.S. § 102(a)(4), and "[e]ffectuate economic justice," 23 P.S. § 102(a)(6).[7]

The lower court's failure to understand and further the objectives of the Divorce Code is revealed by other parts of its opinion as well. The court noted that appellant would

**7.** As an example of his assertion that § 102 cannot serve as an adequate guide to judicial discretion in ruling on applications for transfer, Judge SHERTZ suggests that the objective described in § 102(a)(1)—to "deal[ ] with the realities of matrimonial experience" —is not pertinent to this case because the master's report and the dismissal of the exceptions to it represent an adequate consideration of those realities. Dissenting op. at 710 n. 7. However, the only aspects of the parties' matrimonial experience that were relevant under the Divorce Law were those relating to proof of fault. In deciding whether appellee was entitled to a divorce based on indignities, the master would have had no reason to consider the economic and non-economic contributions of each party to the marriage, or the need of either party for rehabilitative alimony after a divorce. Indeed, it would have been a serious error for the master to give such matters any consideration. Yet it is beyond question that these are important aspects of what the legislature meant by the "realities of matrimonial experience."

Judge SHERTZ also suggests that the objective described in § 102(a)(4)—to "[m]itigate the harm to the spouses and their children"—is not pertinent because permitting the action to proceed under the Divorce Code would not mitigate the harm to the parties' children caused by the dissolution of their parents' marriage. It is not entirely clear what is meant by this statement, but if it is intended as a reference to the fact that the parties' children are grown up or nearly so—having been born in 1959 and 1964—it takes a too short-sighted view of the relationship between parents and children. An adult child is legally responsible for the support of an indigent parent. 62 P.S. § 1973. Thus, above and beyond any emotional considerations, appellant's children have a legal interest in seeing that she as their mother receives the financial protections of the Divorce Code. Hardly any experience can be more upsetting to an adult of middle years than trying to balance the legal and moral responsibilities owed an aged and indigent parent against those owed one's own growing children. One result of the Divorce Code should be to reduce the frequency with which individuals in Pennsylvania find themselves in such a position.

have a right of partition without regard to marital fault. This ignores the legislative judgment that partition has proved to be a totally inadequate means of effectuating economic justice because it applies only to property owned by the entireties—typically, only the family residence. The court noted that appellant had lost on her claim for alimony pendente lite. This observation is not only irrelevant to the question whether appellant should be entitled to the post-divorce benefits provided by the Divorce Code, but it also ignores the fact that the court's order of August 17, 1979, denying alimony pendente lite, was without prejudice, and the additional fact that appellee's answer to appellant's petition for alimony pendente lite stated that the parties were still living together in the marital residence and that he was already supporting her. The court noted that appellant had lost in the divorce action; evidently this was a reference to the fact that after appellant's application had been filed but before the court's opinion in support of its order denying the application, another judge of the lower court had dismissed appellant's exceptions to the master's report, which recommended granting appellee a divorce. In thus pointing to appellant's loss on the merits of a fault—based divorce action, the court ignored the legislature's mandate that under the Divorce Code, marital fault plays no part in the equitable distribution of marital property, 23 P.S. §§ 102(a)(3), 102(a)(6), 401(d), and that marital fault is only one of fourteen factors to be considered with regard to alimony, 23 P.S. § 501(b). Finally, the court suggested that appellant was merely trying to "rehash" claims that she had already lost. This ignores that fact that under the Divorce Law, appellant had no right to equitable distribution of marital property or alimony after divorce; she only has those rights under the Divorce Code. Thus, by filing her application that the action proceed under the Divorce Code appellant was not "rehashing" anything; she was for the first time claiming rights she otherwise could not claim.

It is evident that in denying appellant's application, the lower court consistently ignored the policy of the Common-

wealth and the objectives the legislature intended to achieve by enacting the Divorce Code. Instead, the court based its decision on the punitive philosophy of the Divorce Law, which the legislature has specifically repudiated. In these circumstances we have no hesitancy in concluding that the lower court committed error.

## E

One aspect of this case remains to be considered. It will be recalled from the statement of the case that on April 2, 1980, after nine hearings, the master filed his report recommending that appellee be granted a divorce; that on July 7, 1980, appellant filed her application that the action proceed under the Divorce Code; that on July 29, 1980, the lower court denied her application; and that on September 4, 1980, the lower court entered a decree granting appellee a divorce. Appellee argues that this chronology is "[a] key factor in determining whether the [lower court] abused its discretion [in denying appellant's application]." Appellee's Brief at 30.[8] We find no merit in this argument.

Section 103 of the Divorce Code provides that "[t]he provisions of this act shall not apply to any case in which a decree has been rendered prior to the effective date of the act [July 1, 1980]." 23 P.S. § 103. Plainly, therefore, the legislature intended that an application could be filed *at any time after* the effective date of the Divorce Code, *so long as* a decree had not been filed. The question, therefore, is whether, when an application is timely filed under the Code, the fact that it may have been filed at a late stage of a pending action should be held against it. We can conceive of no reason why it should be.

**8.** We have discussed in the preceding portion of this opinion the lower court's statement of its reasons for denying appellant's application. While the court did not specifically identify the stage of the litigation as one of its reasons, it did say that appellant "has lost all her claims—to support, and in the divorce proceedings—and now, *after months of hearings and expense* to [appellee], she requests a rehash of her claims under 'new' guise, the new Code." Slip op. at 3 (emphasis added). It seems fair to say that the portion of this statement that we have emphasized indicates that the court regarded the stage of the litigation as a factor supporting its order.

As discussed above, the legislature has made plain beyond misunderstanding that in deciding whether to grant an application that a pending action proceed under the Divorce Code, the court is to refer to the declaration of policy in section 102 of the Code, and grant the application, or not, depending upon whether, or not, doing so will further the objectives described by the legislature in declaring that policy. Reference to those objectives will show that the legislature did not intend that an applicant should be penalized because of the happenstance that her (or his) application was filed at a late stage of the litigation. Three of the objectives described are particularly pertinent in this regard. We have already had occasion to quote these, see text accompanying note 5, supra, but to spare the reader from cross-reference, and by way of emphasis, we shall quote them again.

The first objective described by the legislature is that "the law [should deal] with the realities of matrimonial experience." 23 P.S. § 102(a)(1). As we have discussed, one of the realities of matrimonial experience under the Divorce Law of 1929 was that a middle-aged wife, such as appellant, was driven to litigation because of her husband's desire, and threat, to obtain a divorce and cut her off from any economic support. By expressly providing that such a wife could file an application that a pending action proceed under the Divorce Code at any time after the Code became effective, so long as a decree had not been filed, the legislature recognized the realities of the wife's position, and gave her the weapon she might need to protect herself.

The third objective described by the legislature is that "primary consideration [shall be given] to the welfare of the family rather than the vindication of private rights or the punishment of matrimonial wrongs." 23 P.S. § 102(a)(3). Without doubt, if the application of one spouse is to be denied because of the happenstance that it is filed at a late stage of the litigation, that spouse will be punished for matrimonial wrongs, and the other spouse's private rights will be vindicated. Such punishment and vindication are

precisely what appellee seeks here. However, they are also precisely what the legislature has declared it to be against the policy of the Commonwealth for him to have.

Finally, and perhaps most important, the sixth objective described by the legislature is to "[e]ffectuate economic justice." 23 P.S. § 102(a)(6). To deny an application on the ground that it was filed at a late stage of the litigation would defeat this objective, for it would impose upon the denied applicant the terms of the Divorce Law of 1929, which the legislature has repudiated because, among other evils, that law inflicted economic *injustice* on so many. In this regard, the fourth objective described by the legislature may also be mentioned, "[to] [m]itigate the harm to the spouses and their children caused by the legal dissolution of the marriage." 23 P.S. § 102(a)(4). This objective complements and supports the sixth objective, for to inflict economic injustice on one spouse, to the advantage of the other, would not *mitigate* but would *aggravate* "the harm to the spouses." If harm is to be mitigated, economic justice, not injustice, must be effectuated.

We recognize, of course, that when an application is filed at a late stage of the litigation, certain economic consequences may have ensued. Thus in the present case we may assume, as the lower court suggests, that because there have been nine hearings, appellee has incurred considerable legal expense. However, the Divorce Code provides procedures by which such expenses may readily be taken into account by the court when it decides what are the husband's "economic circumstances," when ordering equitable distribution of the marital property, 23 P.S. § 401(d)(10), and also, what alimony, if any, it is reasonable to order, 23 P.S. § 501(b). The mere fact that the husband has incurred expenses cannot justify an order permitting him to inflict economic injustice on his wife.

On Appeal Number 2150: the decree granting appellee a divorce is vacated, the appeal is declared moot, and the case is remanded for further proceedings consistent with this opinion.

On Appeal Number 1902: the order of the lower court denying appellant's application that the action proceed under the Divorce Code is reversed, the application is granted, and the case is remanded for further proceedings consistent with this opinion.

MONTEMURO, J., files a concurring opinion.

POPOVICH, J., files a concurring opinion.

SHERTZ, J., files a concurring and dissenting opinion in which HESTER, J., joins.

WIEAND, J., files a dissenting opinion.

MONTEMURO, Judge, concurring:

For the reasons discussed below, I join in part and concur in part with the holding of the majority.

This divorce action presents a factual pattern that in many aspects is typical of the cases requiring determination of the substantive issue to be determined: the proper interpretation of Section 103 of the Divorce Code of 1980, specifically the meaning of the phrase stating that "upon application granted" a divorce action pending under the Divorce Law of 1929 may proceed under the new Code.

## THE FACTS

The marriage in the instant action is a long-term one of some twenty-two years duration. Two children were born and raised during this time. The wife has functioned as housewife and has also held occasional short-term jobs, but she has no skills at present that would produce a steady, adequate income. The husband, in contrast, earns more than fifty thousand dollars per year and has significant other assets in his own name. Both parties have an entireties interest in the marital home.

The husband initiated the divorce action in January of 1979, and the wife contested his entitlement to a divorce on the grounds that her conduct sprang from mental illness and thus did not constitute indignities. There was no counterclaim.

Master's hearings were held, and on April 2, 1980,[1] the Master filed his report recommending that a decree in divorce be granted. Exceptions were taken to the recommendation of the Master, and in early July, while the matter was still pending, the appellant petitioned for transfer to the 1980 Code.

The court below denied the petition after review of the record, and the wife appealed that decision to this court. The husband then filed a Motion to Quash, which was denied.

Despite the appeal of the wife from denial of her petition to proceed under the new code, the lower court entered a final decree in divorce on September 4, 1980. Wife appealed that Order as well. The two appeals were considered and were argued before this court *en banc* on April 22, 1981. The case thus presents three issues on appeal: whether the final decree of divorce is valid; whether the denial of the petition to proceed under the Code of 1980 is interlocutory; whether the trial court was correct in its decision that the wife's petition for use of the 1980 Code should be denied. The short answer to all the above issues is no; the trial court in this initial incursion into new territory held incorrectly. This concurring opinion will discuss the first two issues briefly and the third issue at length.

## THE DIVORCE DECREE

The issuance of a final decree in divorce in this action was clearly improper. As the majority has noted, an order of the court denying an application as interlocutory does not empower the court below to enter a decree while the appeal is pending. The validity of the appeal is a question for the appellate court. Therefore, the divorce decree entered in this action must be vacated.

1. By an interesting coincidence, the date of filing of the Master's Report was also the date upon which the Legislature passed the Divorce Code of 1980, to take effect on July 1, 1980.

## THE INTERLOCUTORY ISSUE

I also join in the reasoning of the majority that it was error for the lower court to find the appellant's petition an issue which was interlocutory and not immediately appealable. The reasoning of the majority opinion is sound; the wife in these circumstances is effectively out-of-court on those issues which can only be presented under the new code.

Her defense from a divorce recommendation under the Law of 1929 could not include introduction of claims of her own as to equitable distribution of property or alimony, as these claims are non-existent under former law. Conversely, proof of marital misconduct, which is of enormous importance under the Law of 1929,[2] is but a single factor among fourteen others in determining any right to alimony and is irrelevant to equitable division of property.

The majority states the matter clearly: the lower court's denial of the wife's application "did not put appellant completely out of court, for she remains in court to defend appellee's claim to a divorce under the Divorce Law. However, so far as appellant's *own* claims under the Divorce Code are concerned, the order did put appellant completely out-of-court, for it completely deprived her of her day in court on those claims."

Therefore, the decision of the lower court that the appeal was interlocutory and not immediately appealable was error, and this court may review the issue before the rendering of a final decision of the lower court in this action.

## INTERPRETATION OF SECTION 103

I concur in the result of the holding of the majority: Mrs. Gordon should be permitted to proceed with the divorce case under the provisions of the Divorce Code of 1980. I reach

2. Under the Law of 1929, marital misconduct entitled the innocent and injured spouse to absolute divorce and put an end to any possibility of support. Where the parties were only separated or divorced *a mensa et thoro*, the ongoing duty of support was ordinarily terminated upon proof of adultery on the part of the recipient spouse.

that conclusion, however, by reasoning from somewhat different premises. I would note, but would not stress, analysis of language taken from former divorce laws, which in one case is outdated, and in another case, was never enacted by the Legislature. Also, although I do agree with the analysis of Section 103 under the provisions of Section 102 of the Divorce Code, as will be seen in the discussion *infra*, I would broaden the base of inquiry to include other sources of light for interpretation. Specifically, prior divorce procedure, the legislative debates, and statutory instruction on the general problem of statutory construction are relevant to the result I reach.

The interpretation of statutory law is guided by the provisions in Purdon's Pennsylvania Statutes Annotated, Title I, as set forth below:

Sec. 1921. Legislative Intent Controls.

(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.

(b) When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

This opinion will regard section 103 of the Divorce Code in the light of these directives.

A search of the Code itself, and of legislative history, for direct discussion of the phrase "upon application granted" proves fruitless. However, examination of "plain meaning" brings results, and these can be amplified by resort to examination of the circumstances surrounding its enactment, former law and procedure, and the other dictates of Sec. 1921(c).

## INQUIRY INTO LEGISLATIVE INTENT

Since legislative intent controls in the interpretation of statutes, the focus of argument must be to determine the desires of the General Assembly.

The first line of attack for statutory interpretation remains a consideration of the plain meaning of the words of the statute. Clearly, if the words of Sec. 103 were free from *all* ambiguity, the matter would not have been presented to this court *en banc*. Even so, examination of the words themselves yields considerable insight into the intent of the legislature.

Section 103, which contains the phrase to be considered, and which is also intended to provide general information as to the construction of the entire Divorce Code, is set forth below in its entirety:

Sec. 103. Construction.

The provisions of this act, so far as they are the same as those of existing laws, are intended as a continuation of such laws and not as new enactments. The provisions of this act shall apply to all cases, whether the cause for divorce or annulment arose prior or subsequent to enactment of this act. The provisions of this act shall not effect any suit or action pending, but the same may be proceeded with and concluded either under the laws in existence when such suit or action was instituted, notwithstanding the repeal of such laws by this act, or, *upon application granted*, under the provisions of this act. The provisions of this act shall not apply to any case in which a decree has been rendered prior to the effective date of the act. This act shall not affect any

marital agreement executed prior to the effective date of this act or any amendment or modification thereto. (emphasis supplied).

A shortened form of the statement *supra* can be construed which, without distortion, states that "the provisions of this act shall apply to all cases, whether the cause for divorce ... arose prior or subsequent to enactment ... any suit ... pending ... may be ... concluded either under the laws in existence when such suit ... was instituted ... or, upon application granted, under the provisions of this act." The language undeniably contemplates that actions begun under the prior law may be proceeded with under either the old statute or the new. Only the single phrase "upon application granted" presents an ambiguity.

A sensible application of the words to the circumstances surrounding its enactment, *per* Sec. 1921 *supra* at (c)(2), brings forcibly to mind the thousands of outstanding divorce cases pending under former law and the futility of demanding that all parties amend to conform with the new code. Unnecessary paperwork for the judicial system and increased expense for couples merely processing an uncontested divorce through former channels are two undesirable results that the scheme of Sec. 102 avoids.

On the other hand, where a party wished to avail himself of the protection of the new provisions—a clearly permitted option—some orderly process would be needed to inform all parties and the judicial system that an election has been made for change of law. A simple solution is for one party to make application to the court, which in turn acknowledges the decision with an order granting the request. These documents, when docketed, act as notice for an orderly change to the Divorce Code. This was the method chosen by the Legislature.

It is arguable that the wording implies a court decision, not a *pro forma* response. Indeed, wording simply providing that a party could "elect" to proceed under the Code would have appeared to be a possibility, bypassing court approval completely. However, our courts have always held a tight

rein on the procedures governing marriage and divorce. Under former practice, for instance, plaintiff's counsel could not even discontinue a divorce action without court approval, although this is a routine procedure in other civil cases.[3]

Requirement of an application to the court is certainly in line with prior custom and is relevant to interpretation under 1921(c)(5). Legal tradition demands direct court control of procedure in divorce; that tradition can, and apparently has, remained unchanged in the face of enormous substantive differences between prior and present divorce law.

The plain meaning of "upon application granted" does imply some formal exchange between a party who prays a boon and a court which grants that boon, but in light of former practice, an assumption that court discretion should ordinarily extend beyond a weighing of minor jurisdictional averments would be reading too much into the phrase.

The plain words of the statute also *expressly* provide a method for construing the provisions of the Code:

Sec. 102(b): The objectives set forth in Section 102(a) shall be considered in construing provisions of this act and shall be regarded as expressing the *legislative* intent.

The Legislature clearly intended its *own* findings to be the basis of attempts to construe the Code. It is impossible to read an intent that individual judges use their own discretion in construing the directives of the statute, or even that in the process of trial and appeal the judicial system in its collective wisdom should substitute its discretion for that of the Legislature.

Appellant's brief suggests that the Legislature might have followed the wording of the Illinois Divorce Law which provided that all cases pending at the time of the effective date were to be decided under provisions of the new Illinois act. It is true that the Illinois solution, among many others, was an available model. It is also true that not a shred of

3. See discussion at 1 Goodrich-Amram 2d 229:8 and cases cited therein.

evidence exists to show that the Illinois model was ever contemplated by the Legislature or that it has any particular virtue as a practical pattern.[4] Indeed, as discussed *supra*, requiring all outstanding actions to shift to the new Code would appear to promote unwarranted expense and trouble.

A final discussion on the "plain meaning" of the actual words of the statute can be centered around the provisions of Sec. 102(a) which, as we have seen, represent the stated legislative intent and are mandated to be considered in construing the Divorce Code.

This particular argument presents the heart of the matter for interpretation and has therefore been adequately covered by judicial construction several times over in opinions of this court and lower courts. The argument is both central and compelling and will doubtless continue in use for examination of the entire Code. Therefore, in deference to the excellent coverage Sec. 102(a) has already received, I shall offer only a brief review.

The philosophy of the Divorce Code rejects almost completely the assumptions upon which prior Divorce Law was based. Vindication of private rights and punishment of matrimonial wrongs [5] has yielded to a primary consideration for family welfare and an articulated concern to mitigate the harm dissolution of a marriage causes to spouses and their offspring.

Appellee's view that the party seeking to proceed under the Code must "at the very least be free of a claim . . . that substantial harm or detriment would occur if such relief were granted" is simply an example of wishful thinking. The only "substantial harm or detriment" that the legislature had in mind to prevent was the economic injustice listed in Sec. 102. The two concepts, under the instant facts, are simply inconsistent. Vindication of the husband's private

---

4. Judge Spaeth's opinion points out that the roots of the wording chosen lie in the tradition of this Commonwealth's own divorce law drafting.

5. Fault is retained as one ground of divorce, however, and is one of fourteen factors to be considered in awards of alimony.

wrongs by denying use of the Divorce Code to his wife would prevent a fair and just determination of property rights and a consideration of need and ability to pay alimony.

If the lower court properly limits itself to consideration of the objectives enumerated in Sec. 102(a), which were made a basis for construing the provisions of the act in Sec. 102(b) and designated as applicable in *all* cases not finally settled by decree or private agreement in Sec. 103, I am compelled to conclude that a court would have very little to weigh in granting the application of a party to proceed under the new code.

If only considerations stated in the act or unavoidably implied by the statute itself or by 1 Pa.C.S.A. § 1921 may be pondered by the trial judge or master, this statute provides *no* leeway for discussion of court time expended or the private investment of parties in expense or emotional trauma. Legislative history, when examined, supports this view as well.

## LEGISLATIVE HISTORY

Appellee implies that legislative history is not relevant to analysis because the phrase "upon application granted" was not specifically debated. I disagree. Certainly debate on the terms of Section 103 was limited, but it was relevant to our present inquiry.

An amendment was proposed for inclusion in that section which provided that the new act "shall not affect any marital *agreement* executed prior to the effective date of this act . . . ." In explanation of this choice of words, the sponsor drew a parallel to the provision that a final decree in divorce entered before the effective date acts as a bar to the use of the new act:

"... the intent of this part of the amendment is to *treat those matters that have been settled,* either *in court* or out of court, as *settled,* and not allow parties to open them up." Legislative Journal Vol. 1, No. 67, Sept. 25, 1979, pp. 1825–1826 (emphasis supplied).

Further, the sponsor re-emphasized that awards of alimony and equitable distribution would be made only in conjunction with the granting of the decree in divorce under the new code. *Id.* at 1826. The amendment passed without opposition, *id.* at 1827, so we may assume that the legislature endorsed this wholeheartedly. The language was appended just below the wording making a final decree a bar to use of the new Code.

The legislator's choice of language validates the converse of his proposition as equally true: matters not settled are *not settled*, and awards of alimony and equitable distribution, tied irrevocably to a decree in divorce under the new code, are *not determined either*, absent final decree of divorce.[6]

Repeatedly, the legislators emphasized the antiquity of the divorce laws of the Commonwealth. The House sponsor characterized Pennsylvania as having

"... the distinction of having the worst Divorce Code in the entire nation. It has the most unfair law and it offers the least protection to an economically dependent spouse." Legislative Journal, House, Sept. 26, 1979, p. 1851.

Although the former law was officially dated "1929", its philosophical base had been essentially unchanged for almost two hundred years. The Senate sponsor, in an impassioned plea to decide a complete package now and not to defer controversial provisions "to some nebulous future airing", remarked:

"Rarely, Mr. President, do we have a major law or code so utterly antiquated—we have not changed it since 1784 —and so universally condemned, awaiting our attention." Legislative Journal, Senate, March 10, 1980, p. 1369.

Further, the sponsor pointed out that the relative rarity of contested divorces under old law was attributable to the fact that they were hugely expensive, rarely successful, and "vicious, vitriolic, scheming, vindictive and every other ad-

---

6. A final decree in partition of property, like an executed property agreement, would appear to be "a matter settled." There may be other instances of this sort to be considered under future facts.

jective that one would want to apply to the situation." In contrast, he endorsed the expenditure of court time on settlement of property matters: "the courts should be dealing with those situations rather than contested divorce actions . . . and having those [contested actions] take the time of the court or a master . . . ." *Id.* at 1370. The emphasis is unmistakably at odds with any argument that judicial economy is a valuable consideration when contrasted with economic justice.

The sponsors were far from alone in these views. Debate by legislators of all political persuasions and in both houses expressed concern for economic justice between the parties, emphasizing of course the plight of the dependent spouse left with the wreckage of a marriage and very little else, but also reflecting concern for the supporting spouse as well.

The theme of immediate need for just economic provisions was so general and so oft-repeated as to make selection of a sampling of representative statements for the body of this opinion a difficulty.[7]

**7.** This annotation will therefore set forth a few quotations in an attempt to convey the flavor of the spontaneous speeches of the legislators in support of the official "intent and purposes."

(1) "Dependent spouses with serious grounds for divorce but no economic protection under current law would be able to free themselves from intolerable situations without being reduced to poverty." September 25, 1979 at p. 1830.

(2) ". . . I see people right next door to me where the woman is going to be exploited. That poor woman has given her whole life to a man having no possibility of making a proper living and she is being thrown over for a young frill who seduced her husband . . ." September 25, 1979, pp. 1834–1835.

(3) "I submit to you that recognition of this law is not in fact an encouragement of the breakdown of the moral fabric . . . but rather the recognition of a social reality and the granting of the economic security that a dependent spouse has so woefully sought through the centuries that this decrepit divorce law under which we not operate has been in existence. September 25, 1979 at 1849.

(4) Here is a man in his late thirties, and for whatever reasons he has found life at home intolerable . . . . Four years later he is paying 55 percent of his net income to this woman with whom he is not living. October 16, 1979 at p. 2035.

(5) We see justice in terms of the appropriate settlements of rights and responsibilities . . . . Our goal is that both parties can make the best of a future apart from each other. March 10, 1980, p. 1367.

Yet another facet of the legislative findings that becomes clear during a reading of the legislative debates is the lack of rancor felt toward parties for behavior in manipulating the law of 1929.[8] Emphasis was upon economic justice and the two new claims available to effectuate that justice. No disapproval was expressed toward parties for techniques used in battles under the law of 1929. In fact, one of those "realities of matrimonial experience" causing greatest "harm" to the family under former law was repeatedly emphasized in debate to be the unavoidability of bitter, protracted, and perjured actions. The evil was perceived as inherent in the former system of law, and not as attributable to the evil nature of one or the other of the parties.

Therefore, while the expenses of in-fighting under the former law, as clearly set forth in the record of the action, would certainly be applicable to an adjustment of the equities in distribution,[9] those expenses should not be "chalked-up" to the detriment of one party or the other at the discretion of individual judges as a means to permit or deny the use of the new code.[10]

The legislative history on the Code does amplify the meaning of the plain words of the statute as reduced to writing, despite the lack of discussion of the phrase "upon application granted." The legislators regarded the manipulations of parties under prior law as the fault of the law

8. This is not to be confused with attitudes toward marital misconduct leading to need for use of either Divorce Law. Legislators were often deeply condemnatory of bad behavior during the ongoing marriage.

9. Where one spouse has borne all expenses of litigation, or where one has greatly prolonged the process with frivolous issues, Sec. 401(d)(7) may make these contributions and dissipations of the marital property by the respective spouses relevant to an equitable distribution.

10. An instance of this viewpoint is set forth as an example: "For those of you who do not know anything about contested divorces ... the scars rarely heal. It is the adversary system of justice that is most painful. It is a raw, searing battle that some commentators have likened to guerrilla warfare. The rancor and bitterness ... almost guarantees the scaring [sic] of children .... Is that what we want to do? I do not think that we do." Legislative Journal, House, September 25, 1977, p. 1832.

itself, which vitiates appellee's argument that his detriment under prior procedure should weigh in his favor.

Similarly, references to judicial economy were sparse, but the indications certainly favor a view that court time was *not* begrudged for settlement of concerns of "economic justice", although lengthy fault actions were deplored.[11] Only "settled" matters were deemed "settled."[12] Legislative history does not support the view that any fixed point along the progress of the action could be chosen as the decisive factor in whether to grant or deny an application.

## CUSTOMARY PROCEDURE

Earlier in this opinion I briefly discussed the fact that our judicial system has always kept a "tight rein" on the procedure of divorce cases. The usual procedure of the courts can be useful to analysis of the problem presented by Sec. 103 in yet another instance.

There is no provision in the new code for "Petition and Rule to Show Cause" nor is any "hearing" mandated to be scheduled on the matter.[13] The lack of specific provision for a Rule would not necessarily militate against its use. The court in *McCormick's Contested Election*, 281 Pa. 281, 126 A. 568 (1924) concluded as follows:

> "The custom of allowing rules to show cause even when not expressly provided for, is well-established in Pennsylvania." *Id.*, 281 Pa. at 285, 126 A. 568.

The lack of a specific provision for a hearing on the matter, however, does have an important impact on a party's right to demand one as "due process." The *McCormick* court found that the lower court judge was correct in "insisting on strict adherence to statutory requirements," one of which, under the facts of *McCormick*, was that the *statute* provided that "upon petition" the court was to

11. See this opinion supra, above Note #7.

12. See this opinion supra, above Note #6.

13. In contrast, § 201(d)(1) mandates a hearing where either party objects to the three-year unilateral divorce provision.

"appoint a suitable time for a hearing . . ." *Id.* 281 Pa. at 284, 126 A. 568.

The Divorce Code does not provide in its terms for "Petition and Rule to Show Cause", as some statutes and Rules do.[14] More importantly, however, the Code itself does not provide for "hearing" on the matter. The legislators were not naive on the uses of due process, which they discussed in other contexts,[15] and I conclude that the court review contemplated in Section 103 does not reach the level of a hearing on the matter.

## CONCLUSION

Analysis of Section 103 and especially of the wording "upon application granted" can be reasonably made in terms of the statute itself, traditional procedure in divorce, and study of the legislative debates. I conclude that court

14. For instance, Rules of Civil Procedure 3110, 2352, 2353 all specifically mention this procedure as proper.

15. See Note 13, *Supra.* For instance, the legislators debated lack of a hearing on unilateral termination of a marriage at great length. Eventually, safeguards were provided for due process in the form of hearings relating to that portion of the statute. The legislators were fully aware of the value of hearings as necessary for due process in protection of "fundamental" rights—and apparently did not consider a mere change-of-law "fundamental".

Due process does require notice and opportunity to be heard where property rights are at issue, *Commonwealth ex rel. Ryan v. Rundel,* 411 Pa. 613, 192 A.2d 362 (1963). The applicability of the constitutional guarantee of procedural due process depends on the presence of a legitimate "property" interest within the meaning of the Fifth or Fourteenth Amendments. *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

It is axiomatic, however, that a change in law must prove detrimental to the interests of a certain number of the people affected by the change. Courts in the past have faced similar challenges by parties who lose a favored position when "the rules change," and have held that an individual cannot have vested property rights in having "the law remain unchanged for his benefit." *Middleton v. Texas Light and Power Co.,* 249 U.S. 152, 163, 39 S.Ct. 227, 231, 63 L.Ed. 527 (1918).

The legislature might have provided appellant and others like him with the right to a hearing and a judicial determination of equities in this particular matter, but it did not choose to do so and that decision was not unconstitutional.

review was intended, but that such review by no means mandates a hearing. Where cursory review under the considerations set forth in Section 102 leaves a lower court with any doubt that legislative intent would be furthered by granting of the application, a hearing could be requested to clarify the record. This would be rare indeed, perhaps as rare as hearing and denial of a petition for discontinuance under the Law of 1929.

I am not, however, prepared to agree with Judge Popovich that an application must be granted *pro forma* upon the application of a party. The actual facts of cases have a seemingly endless capacity to present situations that could never be anticipated. The wording of "upon application granted" does imply review.

For all of the above reasons, I would reverse the divorce decree, hold the denial of appellant's petition to be appealable, and find the lower court in error in its decision not to permit Mrs. Gordon to transfer this action to the Divorce Code of 1980.

POPOVICH, Judge, concurring:

I join the majority's decision which allows the appellant, Rosemarie Gordon, the opportunity to proceed under the new Divorce Code. The Divorce Code, Act of April 2, 1980, P.L. 63, Act No. 26, 23 P.S. § 101 *et seq.* However, I cannot subscribe to the majority's views (1) that the words "upon application granted" "necessarily impl[y] that the court must exercise *some* discretion," at 692, (emphasis added) and (2) that "in most cases, the answer should be easy; for the legislature has stated its objectives, and the philosophy underlying them, with clarity." *Id.*

First of all, in this writer's mind, the words "upon application granted" are susceptible to more than one interpretation: i.e., the motions court is to grant *pro forma* the application presented by either party without inquiry into the merits, or the court in its discretion can refuse to grant the transfer. 1 Pa.C.S.A. § 1921(a). Given this bifurcated interpretation, it cannot be denied that the statute is ambig-

uous.[1] *See Faivre v. Faivre,* 182 Pa.Super. 365, 371, 128 A.2d 139, 143 (1956); *City of Philadelphia v. Schaller,* 148 Pa.Super. 276, 282, 25 A.2d 406, 409 (1942), *cert. denied* 317 U.S. 649, 63 S.Ct. 43, 87 L.Ed.2d 522 (1942). Because ambiguity exists in the language in question, guidance is found from accepted rules of statutory construction, to-wit: the occasion and necessity for the statute; the mischief to be remedied; the circumstances under which it was enacted; the object to be attained; the consequences of a particular interpretation; the former law, if any, including other statutes upon the same or similar subjects; the contemporaneous legislative history; and the legislative and administrative interpretations of such statute. See 1 Pa.C.S.A. § 1921(c)(1–8); see also *Commonwealth v. Pa. State Univ.,* 463 Pa. 606, 345 A.2d 695 (1975); *In Re Jones and Laughlin Steel Corp.,* 263 Pa.Super. 378, 398 A.2d 186 (1979), affirmed 488 Pa. 524, 412 A.2d 1099 (1980); *Jewelcor, Inc. v. Commonwealth,* 54 Pa. Cmwlth. 387, 421 A.2d 517 (1980); see generally 2A Sutherland, Statutory Construction § 4502 (3d ed. rev. 1973).

The legislative objectives set forth in the new Code have been adequately covered by the majority; however, according to this writer's view, an important factor which tips the balance in favor of adopting a *pro forma* approach is a consideration of the consequences of adopting a different statutory interpretation.

The majority does not adopt either a *pro forma* approach or a strict discretionary approach. Instead, it adopts an

---

1. This writer agrees with the definition set forth by the Wisconsin Supreme Court when it said:

> "[A] statute, or any sentence, clause or word thereof, is ambiguous only when '. . . it is capable of being understood by reasonably well-informed persons in either of two or more senses.' The test is whether '. . . "well-informed persons" *could have* become confused.' [6]
>
> [6] . . . 'However, when a case comes before this court it is obvious that people disagree as to the meaning to be given to a statute. This is not controlling. The court must determine whether "well-informed persons *could have* become confused." ' " *Wisconsin Dept. of Revenue v. Nagle Hart, Inc.,* 70 Wis.2d 224, 227–228, 234 N.W.2d 350, 352 (1975). (Emphasis in original) (Footnote omitted) (Citation omitted).

intermediate construction of the statute which, on the one hand, "see[s] no problem with the procedure followed in Philadelphia County, where applications for transfer are routinely granted . . . . . ," at 690 ftn. 6, yet, on the other hand, concludes that the "phrase 'upon application granted' implies that the application may be denied". at 693. This writer submits that such vague and conflicting pronouncements offer little guidance to a trial judge whose decision it will be to decide the merits of a transfer application. A review of the facts of the instant case offers some insight into why a discretionary standard will not be, as the majority predicts, so "easy" to apply.

At the trial level, the court below entertained appellant's application to proceed under the new Divorce Code and *denied* the petition on the basis that " '[t]here are no equitable considerations in favor of allowing [appellant] to proceed under the new code.' " at 693. Ironically enough, a majority of this Court pays lip service to the principle that "the *court to which the application is presented* must decide whether to grant or deny the application[,]" at 693 (emphasis added), yet reverses the trial court whose decision it was to "decide whether to grant or deny the application" in the first instance. *Id.* Indeed, an already protracted court proceeding would be delayed further and the implementation of the new Divorce Code held in abeyance, as appeals invariably would be lodged from the trial court's ruling, as is the case here. Additionally, a disposition on the question of whether or not to grant a divorce would be postponed by the necessity of review by one or more appellate courts. Moreover, factual hairsplitting over the specific application of the legislative objectives to the facts at hand would occur; consequently, judges in the same courthouse applying these objectives to the same set of facts predictably may reach different results.[2]

2. A brief overview of the cases which, to date, have been appealed to this Court are representative of the different approaches courts of this Commonwealth have used to grapple with the transfer issue. Both petitions were denied in cases emanating from Delaware and Bucks Counties. See *Gordon v. Gordon,* 293 Pa.Super. 491, 439 A.2d

Such unfavorable consequences, we have said, are to be considered by a court when a statute is susceptible to more than one interpretation:

"[W]hen a statute is ambiguous in terms or fairly suscepti-
ble of two constructions, the injustice, unreasonableness,
absurdity, hardship, even the inconvenience which may
follow one construction may properly be considered and a
construction of which the statute is fairly susceptible may
be placed on it that will avoid all such objectionable
consequences and advance what must be presumed to be
its true object and purpose." *Hooks v. Hooks*, 123 Pa.Su-
per. 507, 513, 187 A. 245, 247 (1938).

With a *pro forma* approach, these objectionable conse-
quences will be avoided.

The majority cannot accept this writer's view because a
*pro forma* construction "does unnecessary violence to the
legislative choice of language." at 693. What the majority
fails to recognize is that its own construction of the statute
is belied by the wording of that phrase. If, as the majority
suggests, the "phrase 'upon application granted' implies that
the application may be denied", at 693 and since the word
"granted" is not modified by any other clause, there is no
textual support for the majority's restrictive interpretation
that "the range of discretion is *extremely narrow*, being
limited to a consideration of whether granting the applica-
tion will be consistent with the objections described in
section 102 of the Divorce Code." at 692. (emphasis added).
Either the words of the statute imply discretion or they do
not.

The majority, even under its own theory, is reading too
much into the statute by construing the words of "discre-
tion", "upon application granted" to mean that the trial

683 (1981) (Delaware County); *Miller v. Miller*, Pa.Super., (1981) (J.
860/81, filed 1981) (Bucks County).

In Allegheny and Montgomery counties, courts granted transfer
petitions even though hearings had been held. *Conrad v. Conrad*,
293 Pa.Super. 558, 439 A.2d 717 (1981). As already stated infra at
704, Philadelphia County has adopted a policy that applications are
to be granted *pro forma*.

court's exercise of discretion is "extremely narrow". A more balanced and straightforward approach would be to grant *pro forma* a petition filed by either party to proceed under the new Divorce Code in pending suits, except in those cases in which a final decree has not been entered below prior to the effective date of the new Code.

SHERTZ, Judge, concurring and dissenting:

I agree that the trial court was without jurisdiction to enter the decree of September 4, 1980, and that the decree granting appellee a divorce must therefore be vacated and Appeal Number 2150 dismissed as moot. I also agree that the trial court's order denying appellant's application to proceed under the Divorce Code of 1980 ("Divorce Code") is immediately appealable. In all other respects, however, I respectfully dissent.

## I.

The question before this Court is, as aptly stated by the majority: How should a court decide whether to grant an application to proceed under the Divorce Code. The resolution of this issue turns on an interpretation of § 103 of the Divorce Code, which states that:

The provisions of this act, so far as they are the same as those of existing laws, are intended as a continuation of such laws and not as new enactments. The provisions of this act shall apply to all cases, whether the cause for divorce or annulment arose prior or subsequent to enactment of this act. The provisions of this act shall not affect any suit or action pending, but the same may be proceeded with and concluded either under the laws in existence when such suit or action was instituted, notwithstanding the repeal of such laws by this act, or, upon application granted, under the provisions of this act. The provisions of this act shall not apply to any case in which a decree has been rendered prior to the effective date of the act. This act shall not affect any marital agreement

executed prior to the effective date of this act or any amendment or modification thereto.

23 Pa.Stat.Ann. § 103 (Purdon Supp. 1981–82).

Initially, I note two aspects of this section. First, although the Divorce Code's prospective application is mandated in the affirmative, its application to pending actions is phrased in the negative; that is, the provisions of the act *"shall not* affect any suit or action pending . . . ."* (emphasis added). Second, a pending action may proceed under the Divorce Code only "upon application *granted* . . . ."* (emphasis added). In my opinion, a reading of these two clauses leads to but one conclusion: that the legislature intended trial judges to have and to execute meaningful discretion to grant *or to deny* applications to proceed under the Divorce Code. Any other conclusion would, it seems to me, contravene the specific language of section 103.

Several considerations support what I discern to be the legislative intent regarding interpretation of the phrase "upon application granted." First, the word "grant" (or a variation thereof) appears at least fifteen times in the Divorce Code.[1] Without engaging in an exhaustive review, the following sections are illustrative of the sense in which the word "grant" is used:

Section 201(a) states that "[i]t shall be lawful for the court to *grant* a divorce . . . *whenever it shall be judged* that the other spouse shall have . . . ."* (emphasis added).

Section 201(d)(2) states that "[i]f the court determines that the marriage is irretrievably broken, *the court shall grant a divorce. Otherwise, the court shall deny the divorce."* (emphasis added).

Section 401(c) states that the court "*. . . may *grant* such other relief or remedy as equity and justice require against either party. . . ."* (emphasis added).

---

1. In addition to section 103, the word "grant" appears in sections 102(a)(6), 201(a), 201(b), 201(c), 201(d)(1), 201(d)(2), 301(a), 301(b), 401(b), 401(c), 401(j), twice in 403(c), and 702 of the Divorce Code.

Section 403(c) states that "[t]he court shall *grant* the petition *upon a finding* of a failure to disclose such assets as required under subsection (b)." (emphasis added).

In each instance, it is clear that the legislature's use of the word "grant" manifestly requires the decision maker to operate within certain parameters; that is, the trial judge must find certain criteria to have been met before the relief sought is permitted, allowed or "granted". Implicit in sections 201(a), 401(c) and 403(c), and explicit in section 201(d), is the notion that the trial judge may deny the relief sought. I find it most unlikely that the legislature would have intended the word "grant", as used throughout the Divorce Code, to be susceptible of more than one interpretation.

Second, if the legislature had intended that an application to proceed under the Divorce Code be granted automatically, or virtually so, upon request, it could easily have included clear language to that effect. Or it could have included, as the Illinois legislature did, an express retroactivity provision. In enacting the Illinois Divorce Code in 1977, the Illinois legislature incorporated the following language:

Section 801(b). This Act applies to all pending actions and proceedings commenced prior to its effective date with respect to any issue on which judgment has not been entered. Evidence adduced after the effective date of this Act shall be in compliance with this Act.

Act of Oct. 1, 1977, Pub.L. No. 80–923, § 801(b), Ill.Rev.Stat. Ch. 40, § 801(b). The Pennsylvania legislature could have adopted similar language but, significantly, it did not, even though section 103 does contain such an express provision regarding the prospective application of the Divorce Code, i.e. "The provisions of this act shall apply to all cases, whether the cause for divorce or annulment arose prior or subsequent to enactment of this act."

Third, the majority states that the new Divorce Code is a "drastic and dramatic" repudiation of the Divorce Law of 1929 ("Divorce Law") and that, therefore, applications to proceed under the Divorce Code should be granted, virtually on a pro forma basis, because to do otherwise would be

contrary to its underlying philosophy. I take issue with the majority's characterization inasmuch as it ignores the fact that all fault grounds for divorce have been preserved in the Divorce Code, the parties may still proceed under the Divorce Law and the punishment concept is retained in the Divorce Code provisions permitting alimony to be denied or diminished by virtue of, inter alia, marital misconduct. *See* section 501(b)(14). Thus, I believe that the "drastic and dramatic" characterization is unwarranted. The majority further asserts that, in enacting the Divorce Code, the legislature repudiated the notion that the trial court should be concerned with the vindication of private rights and the punishment of matrimonial wrongs.[2] I consider this, too, an overstatement. The language in question, found in section 102(a)(3) reads, "give *primary consideration* to the welfare of the family *rather than* the vindication of private rights or the punishment of matrimonial wrongs." (emphasis added). It is my view that the legislature intended only that the vindication of private rights or the punishment of matrimonial wrongs be subordinated to the welfare of the family, and not that they be ignored.

Finally, the majority compares the language in section 102 of the Proposed Divorce Code of 1961 (Proposed Code) to the language in Section 102 of the Divorce Code and concludes that the factors enumerated in section 102 are the exclusive

**2.** The mischief which can result from such an overstatement is made manifest in the majority's criticism of the lower court's reference to the fact that Appellant had lost in the divorce action: "In thus pointing to appellant's loss on the merits of a fault-based divorce action, the court ignored the legislature's mandate that under the Divorce Code, marital fault plays no part in the equitable distribution of property, and that marital fault is only one of the fourteen factors to be considered with regard to alimony." at 694 (citations omitted). The majority's reasoning is founded upon a flawed premise, i.e. that because marital fault may not be considered in connection with the equitable distribution of property, it must similarly be ignored when giving consideration to an application to proceed under the Divorce Code. The Divorce Code does not support such a premise. Rather, to the extent that section 102(a)(3) is to be considered in acting upon such an application, it permits, if it does not require, that "punishment of matrimonial wrongs" be at least given secondary consideration.

factors to be considered by the trial court in deciding a transfer application. I disagree with this analysis for several reasons. First, section 102 of the Divorce Code differs from section 102 of the Proposed Code in that the Divorce Code omits the reference to "*any* provisions" (emphasis added) found in the Proposed Code. The Divorce Code provides only that the objectives listed in section 102 shall be considered in "construing provisions of this act", whereas the language of the Proposed Code mandated consideration of section 102 objectives in "construing *any* provisions of this act." [3] Consequently, I am not convinced that section 102 of the Divorce Code *necessarily* mandates consideration of the section 102 objectives in construing section 103, the "pending proceedings" provision. Second, I believe it is a mistake for the majority to place reliance on a comment to a proposed, but unadopted code, when attempting to interpret a Divorce Code provision which utilizes different language. Third, there is no language in the Code which supports the majority's arbitrary view that section 102 factors are the sole criteria to be considered in evaluating a transfer application, nor even which supports a view that such factors are dispositive or controlling when they are in conflict with equitable considerations.[4]

I am in agreement with Judge Popovich insofar as he concludes that the words "upon application granted" either imply discretion or they do not.[5] Thus, if discretion *is*

3. Unquestionably, it was the reference to "*any* provisions" which prompted the official comment to section 102 of the Proposed Code to note: "The provisions of this section ... are intended to apply to the entire code, including provisions of Section 104 relating to 'Pending Proceedings.'" *See* at 689. There is no official comment to the Divorce Code, and section 102(b) thereof, in significantly omitting the word "any", does not support a construction such as quoted above.

4. Section 102(b) of the Divorce Code merely provides:
The objectives set forth in subsection (a) shall be considered in construing provisions of this act and shall be regarded as expressing the legislative intent.

5. If, as the majority suggests, the "phrase 'upon application granted' implies that the application may be denied", at [693], and since the

implied, as I conclude, and the majority agrees, then that discretion cannot be limited to a review of section 102 factors; it is limited only by ordinary constraints on the equitable powers of the Court. The majority's conclusion that the "range of discretion is extremely narrow," at 692, justifies Judge Popovich's view that the majority merely "pays lip service to the principle that 'the court *to which the application is presented* must decide whether to grant or deny the application.'" At 705, (Popovich J., concurring) (emphasis in original).

To merely pay "lip service" to the phrase "upon application granted" flies in the face of the legislature's clearly expressed intent to permit retrospective application of the Divorce Code only at the discretion of the courts. Moreover, it violates the fundamental rule of statutory construction that statutes, other than those affecting procedural matters, must be construed prospectively except where the legislative intent that they shall act retrospectively is so clear as to preclude all questions as to the intention of the legislature. *Farmers National Bank and Trust Co. v. Berks County Real Estate Co.*, 333 Pa. 390, 5 A.2d 94 (1939); *Costa v. Lair*, 241 Pa.Super.Ct. 517, 518, 363 A.2d 1313, 1314 (1976); *See* 1 Pa.Con.Stat.Ann. § 1926 (Purdon Supp. 1981–82). Given the well settled rules and strong public policy against retrospective operation, the statutory exception "upon application granted" must be strictly construed. The majority's "lip service" utterly fails to satisfy this requirement.

For the foregoing reasons, I conclude that the decision, whether to grant or deny an application to proceed under the Divorce Code, is within the discretion of the trial judge. That is, the application should neither be granted nor denied pro forma. Rather, the decision must depend, in the first

word "granted" is not modified by any other clause, there is no textual support for the majority's restrictive interpretation that "the range of discretion is *extremely narrow*, being limited to a consideration of whether granting the application will be consistent with the objectives described in section 102 of the Divorce Code." At [693] (emphasis added). Either the words of the statute imply discretion or they do not.

At 705, (Popovich, J., concurring).

instance, upon the exercise of sound discretion by the court in which the action is pending.

## II.

The next step then is to determine the factors to be considered by the trial court in the exercise of its discretion. The majority relies exclusively upon section 102 for determining when an application should be granted, and concludes that, properly considered, the objectives therein set forth will mandate granting the application in virtually every case.

At least one commentator has noted that the language of the Divorce Code suggests that other factors may be relevant in evaluating a transfer application:

"In its generally broad terms, the Act at least implies application by either party and a discretionary power in the court to grant or refuse the request. As the case law develops, it is possible that such factors as the timing of the filing of the complaint, the progress of the case, the time or expenses incurred at the time of application, and even equitable principles such as laches will become determinative."

Perlberger, Pennsylvania Divorce Code § 2.3.2 (1980). Perlberger posits that the legislature may have provided a transfer procedure in anticipation that cunning practitioners would file suit between the passage of the new act and its effective date in order to gain a tactical advantage. Pennsylvania Divorce Code, *supra*. Under this view, transfers would be granted only under the narrowest circumstances, *i.e.*, where an action was filed solely to avoid the application of the Divorce Code.

To grant applications to proceed under the Divorce Code in the manner advocated by the majority would obviate the need to balance the objectives enumerated in section 102 and would eliminate consideration of other factors. However, such a course necessitates an impermissible disregard of the clear language of the statute.

The proper solution, I believe, is for the court, before whom an application is pending, to consider the section 102 objectives *as well as all other equitable considerations*,[6] to balance the equities and make a determination accordingly. The balancing test should be conducted in the following fashion. The party making the application ought to bear the burden of persuasion and be required to show that there are equitable considerations that will be furthered if the application is granted. When such a showing has been made, the party opposing the petition will be required to present evidence that the movant will be unfairly advantaged, or that the opposing party's rights will be unduly prejudiced, if the action were to proceed under the Divorce Code. If the trial judge is then able to conclude that the equities favor proceeding under the Divorce Code, the petition should be granted.

Such a balancing test would, I believe, satisfy the legislative intent, protect the interests of the parties and provide the trial judge with an appropriate framework for decision-making. It would, in addition, be a more equitable, and yet more pragmatic approach, than the suggestion, set out in the majority opinion, that "[i]f granting the application will

**6.** In addition to the factors set out in section 102, the following criteria ought also to be employed in determining whether an application for permission to proceed under the Divorce Code of 1980 should be granted:

(1) Judicial time already expended;

(2) The length of time the action has been pending;

(3) The stage that the proceedings have reached at the time the application is filed;

(4) The relative good faith of the parties, i.e., whether one party appears to have deliberately delayed the matter so as to prolong it beyond the effective date of the Divorce Code, on the one hand, or to have deliberately hastened an adjudication so as to preclude application of the Divorce Code, on the other;

(5) The costs and fees that have been incurred;

(6) The anxiety, trauma and disruption that has been experienced by the parties and their minor children, if any, by virtue of the length of time the action has been pending and is likely to continue should the application be granted.

The foregoing list is not intended to be all inclusive. It merely represents some of the considerations that would appear to be relevant to a trial judge's ruling on an application to proceed under the Divorce Code.

further [the] objectives [set out in section 102], the court should grant the application, if granting the application will be inconsistent with those objectives the court should deny the application." At 690. Such a solution, though superficially attractive in its seeming simplicity, fails to take into account several important factors.

First, there may be instances where granting the application will be consistent with some objectives of section 102(a) and inconsistent with others. Second, although the criteria set out in section 102 evince the legislative intent behind the enactment of the Divorce Code in the first instance, standing alone they do not provide adequate guidance to trial judges presented with an application by a party seeking to proceed under the Divorce Code. For example, there are cases, such as the instant one, where the section 102 objectives afford little, if any, guidance to the trial court.[7]

7. Applying the pertinent provisions of section 102(a) to the application in the instant case, as does the majority, the following conclusions may be drawn:

(1) Section 102(a)(1) is not pertinent instantly since the evils it seeks to eliminate are no longer present in the case. That is, there has been an extensive hearing on the issue of grounds, the master has recommended divorce and exceptions thereto have been dismissed. Thus, "the realities of the [Gordon's] matrimonial experience" have been adequately considered. The majority asserts that such matters as the contributions of each party to the marriage, or the need for rehabilitative alimony, have not been considered. This assertion is true, but begs the question. Otherwise, as the majority recognizes, every application will perforce be granted, since such factors will never have been considered in matters pending under the Divorce Law;

(2) Section 102(a)(3) is likewise uninstructive in the instant case since permitting this action to proceed under the Divorce Code would not demonstrably "give primary consideration to the welfare of the family";

(3) Section 102(a)(4) also is not helpful. Permitting the action to proceed under the Divorce Code at this juncture would not mitigate the harm to the "children caused by the legal dissolution of the marriage." To suggest, as does the majority, that the harm to children which is to be mitigated includes the avoidance of any future financial responsibility they might incur as to one or the other of their divorced parents, is to engage in unwarranted speculation and to stretch judicial construction of legislation beyond its breaking point. Further, while granting the application might mitigate the harm to Appellant-wife, I believe that it would exacer-

Third, although the majority recognizes that granting an application to proceed when the pending action is at an advanced stage may cause certain "economic consequences," at 696, it fails to consider other significant and adverse consequences that are the invariable concomitants of prolonged divorce litigation. The emotional and psychological wounds, suffered by the parties and members of their family, as they await a final disposition so that they may "pick up the pieces" and commence new lives, will be exacerbated by the grant of an application to proceed under the Divorce Code. These effects cannot be alleviated by any subsequent adjustments in the distribution of the marital property. Rather, I believe they are factors that must be taken into account when considering an application to proceed under the Divorce Code. The analytical framework I advocate will allow a trial judge to weigh both the economic and equitable aspects of allowing an action to proceed under the Divorce Code.

I do not suggest that the posture or stage of the pending action be the sole consideration in determining whether to grant a petition to proceed under the Divorce Code. However, simple fairness dictates that the stage of the proceedings be given some consideration in determining whether the parties should be required to proceed under the Divorce Code.[8] If, for instance, the action had been commenced

bate the harm to Appellee-husband. Thus, "the harm to the *spouses*" would not be mitigated;

(4) Finally, section 102(a)(6) states that economic *justice* should be effectuated—not economic equality. Appellant in the instant case had the burden of persuading the trial court that allowing the action to proceed under the Divorce Code would effectuate and insure such "economic justice." On the record before this Court, I do not believe that the trial judge abused his discretion in concluding, by implication, that Appellant failed to do so.

Thus, the criteria set out in section 102(a) do not necessarily provide either an easy or a clear-cut means of assessing the merits of a petition to proceed under the Divorce Code.

8. The majority concludes that "if the application of one spouse is to be denied because of the happenstance that it is filed at a late stage of the litigation, that spouse will be punished for matrimonial wrongs." At 696. This conclusion is palpably incorrect for several reasons. First, it is built on a faulty premise, i. e. that the court is

prior to July 1, 1980, but no hearings had been held, there would be little, if any, reason for not allowing the action to proceed under the new law. On the other hand if, on July 1, 1980, the trial of the issues had been held and the proceedings were complete except for the entry of a decree by the court, a court should proceed cautiously before requiring the parties to change course and proceed under the new law.[9]

In order to promote uniform and certain results, the majority implicitly, and the concurring opinion of Judge Popovich expressly, would, respectively, severely restrict or wholly deny the discretion of the trial court. I submit, however, that both approaches are in conflict with the express intent of the legislature. If the uncertainty, which would assertedly be the inevitable concomitant of discretion, is to be supplanted by the certainty which would attend the arbitrary granting of all petitions filed, then the legislature can and should amend the Divorce Code. It is within the province of the legislature to do just that. However, to date, such "corrective" legislation has not been adopted.[10]

"punishing" a party when it denies extraordinary relief which the court may grant, or deny upon the proper exercise of its discretion. Second, it ignores the possibility that a dilatory application may properly be denied as punishment for *litigation* wrongs, as opposed to marital wrongs.

**9.** I believe that the court should consider, inter alia, whether the transfer would cause unreasonable inconvenience, vexation, harassment, expense or prejudice to any party. *See e. g.*, Pa.R.C.P. 229(c). *See* n.6 *supra*.

**10.** House Bill 508, introduced on February 10, 1981, provides, inter alia:
"Section 1. Section 103, act of April 2, 1980 (No. 26), known as the 'Divorce Code,' is amended to read:
Section 103. Construction.
The provisions of this act, so far as they are the same as those of existing laws, are intended as a continuation of such laws and not as new enactments. The provisions of this act shall apply to all cases, whether the cause for divorce or annulment arose prior or subsequent to enactment of this act. The provisions of this act shall not affect any suit or action pending, but the same may be proceeded with and concluded either under the laws in existence when such suit or action was instituted, notwithstanding the repeal of such laws by this act, or, upon [application granted] *the filing of a praecipe by either party*, under the provisions of this act. The

### III.

I turn now to an examination of the implementation of the solution I espouse and its application to the present case. First, the party seeking to proceed under the Divorce Code would file an application with the lower court. Next, the trial court would ordinarily hold a hearing on the application.[11] The hearing would serve several purposes. It would enable the trial judge to fully scrutinize the merits of the petition. It would also provide a record for appeal purposes.

Although no evidentiary hearing was held on the transfer application in the instant case, the trial court, upon stipulation of counsel, considered the averments in the transfer petition and answer, as well as the testimony and record of the divorce proceedings. The court found that the divorce action was begun in January of 1979, more than a year and a half before the filing of the petition. Further, the trial court found that a master had been appointed, numerous master's hearings held, and that a recommendation by the master was made that Appellee be granted a divorce from Appellant. Exceptions were filed, heard and ultimately dismissed on July 15, 1980. T.C. Slip Op. at 2. Based upon all the foregoing, the trial court found no equitable considerations in favor of allowing Appellant to proceed under the Divorce Code. T.C. at 3.

The facts relied on by the majority, at 693–694, were controverted by Appellee's reply to Appellant's transfer

provisions of this act shall not apply to any case in which a decree has been rendered prior to the effective date of the act. This act shall not affect any marital agreement executed prior to the effective date of this act or any amendment or modification thereto.
 Section 2. This act shall take effect immediately."
Pa.Leg. [Session of 1981], House Bill No. 508, Printer's No. 535.
 That such an amendment has been introduced clearly suggests that the Divorce Code, as enacted, does not contemplate, nor permit, the virtual pro forma grant of applications advocated by the majority.

11. I have no quarrel with the majority's conclusion that a formal evidentiary hearing is not necessary where, as here, the parties stipulate to the evidence. At 690. Nor would a hearing be required if the application was unopposed.

petition. Questions of fact on motions and other special proceedings are for the lower court to resolve and the lower court's findings will be respected on appeal when supported by the record. *See, Pennsylvania Power & Light Co. v. Gulf Oil Corp.*, 270 Pa.Super.Ct. 514, 411 A.2d 1203 (1979), cert. denied 446 U.S. 966, 100 S.Ct. 2943; *Com. ex rel. Schwarz v. Schwarz*, 252 Pa.Super.Ct. 95, 380 A.2d 1299 (1977). Absent an error of law or a clear, manifest abuse of discretion, the lower court's decision should not be reversed. *See, Moss v. Consolidated Rail Corp.*, 277 Pa.Super.Ct. 192, 419 A.2d 727 (1980). I find neither an error of law nor an abuse of discretion and, accordingly, I would affirm the order of the trial court.

HESTER, J., joins in this concurring and dissenting opinion.

WIEAND, Judge, dissenting:

For reasons appearing in my concurring opinion in *Toll v. Toll,* 293 Pa.Superior Ct. 549, 439 A.2d 712 (1981), I would hold that the order appealed from in the instant case is interlocutory. Therefore, I would quash the appeal.

If I were to reach the merits of the appeal, I would join that portion of Judge Shertz's opinion which concludes that an application to allow a pending divorce action to proceed under the newly enacted Divorce Code of 1980 was intended by the legislature to be granted or refused according to the exercise of a sound discretion by the trial court. I would also find, as does Judge Shertz, that the trial court in this case was not guilty of an abuse of discretion.