## Goodman v. Goodman

*Parker H. Wilson,* for plaintiff.
*Albert. Momjian,* for defendant.

YOHN, *J.,* December 1, 1988 — David Goodman (husband) filed a complaint seeking a divorce from Constance C. Goodman (wife) and raising various economic claims including equitable distribution of marital property, alimony pendente lite and counsel fees and costs. Within the context of the divorce complaint, there was also a claim for child support filed on behalf of wife. After numerous hearings, a decision and decree nisi was issued on February 4, 1988. Both parties filed motions for post-trial relief. After oral argument, the court issued a final decree and order on June 28, 1988. Wife now appeals raising four issues relating to equitable distribution and support.

### FACTS

The relevant facts concerning the parties may be summarized as follows: Husband and wife were

married on August 22, 1965. It is the first marriage for each. They are the parents of Derek Goodman, born July 27, 1970, who is now 18 years of age and Alex Goodman, born November 8, 1972, who is now 16 years of age. The parties lived together at various residences until they moved into the marital home at 1201 Grenox Road, Wynnewood, Montgomery County, Pa. in 1980. They remained at that location until wife left the marital home on June 15, 1984. After several intervening residences, wife now resides at 414 Penn Road, Wynnewood, Montgomery County, Pa., within walking distance of the marital home. There is a joint custody order with the parents dividing custody of the children on an equal basis.

Husband is 44 years of age. He graduated from Harvard University and has a medical degree and a Ph.D. in biochemistry from the University of Pennsylvania. He is currently a professor of pathology at the University of Pennsylvania Medical School and earns a net taxable income of $94,000 per year after deducting involuntary payments to a TIAA/CREFF retirement account and a variable annuity contract with the Equitable Life Assurance Society of the United States. He is in good health except for a period of depression in 1983 due to a career and marital setback. Husband has been living with Dr. Judith Greenacre since March 29, 1987. She is a medical doctor at Temple University Hospital and has her own apartment in Philadelphia.

Wife is 45 years of age. She graduated from Wheaton College in 1964, has a master's degree from the University of Pennsylvania and is a part-time law student at the University of Pennsylvania. Wife worked throughout much of the marriage, moved to different locations when husband's employment required him to do so, assisted husband in

his occupation by entertaining his business friends, and was the primary nurturer of their children. Wife is currently employed as the judicial inquiry officer at the University of Pennsylvania and earns $33,000 per year. Wife began psychotherapy in 1965, has continued treatments thereafter and still incurs substantial annual bills for therapy. She has a neurosis but states that it does not affect her ability to function and that she takes no medication. Otherwise, she is in good health. Wife began living with David Sanderson on February 14, 1986.

## ISSUES

In this instant appeal wife raises the following issues:

(1) Wife contends that the court erred in its computation of husband's expenses for support purposes since it did not "take into account" the claim that Dr. Greenacre should be required to contribute to the expenses of the home which she now occupies with husband, especially in view of her substantial assets and significant income.

(2) Wife contends that "the lower court erred in its order of June 28, 1988 in denying defendant's application to proceed under the February 12, 1988 amendments to the Divorce Code."

(3) Wife contends that "the lower court mistakenly noted in its June 28, 1988 order that 'wife agreed to the distribution of the personalty as set forth in paragraph no. 21 of the decree nisi with the exception of one ceramic lamp.' " Wife contends that no such agreement took place at oral argument and that the lower court erred in its distribution of personal property.

(4) Wife contends that "the lower court erred in its treatment of the Swampscott property. First, it should not have included as marital property any in-

crease in value of the property. Secondly, even if the increase in value is marital property, such increase should have been cut off as of the date of separation."

## DISCUSSION

### Child Support

The first issue before this court is whether husband's living expenses should be reduced by projected reasonable contributions from his paramour, Dr. Greenacre, thus enabling husband to have a greater amount of disposable income available with which he could contribute to the support of his minor children.

The language in wife's statement of matters complained of raises a broader issue in that it contends that the court erred in utilizing the formula found in *Melzer v. Witsberger,* 505 Pa. 462, 480 A.2d 991 (1984) for determining a parent's child support obligation. However, wife's counsel stated at oral argument that he was not pursuing the issue of the application of *Melzer* other than the contention concerning Dr. Greenacre's contribution to husband's expenses and, in fact, the broader issue was neither briefed nor argued.[1]

Thus, in accordance with wife's counsel's statement at oral argument, the only issue raised as to support relates to wife's contention that husband's living expenses should be reduced by a projected

---

1. In any event, the court dealt with the application of the *Melzer* formula extensively in pages 17 through 20 inclusive in its decision and decree nisi. Following the guidelines set forth in *Melzer* the court made a thorough investigation of the needs of the children and the respective abilities of the parents to support their children. The court's determination of the parties' support obligations was consistent therewith.

reasonable contribution from his paramour, Dr. Greenacre, and that the court erred in not considering Dr. Greenacre's ability to contribute to the expenses of the household of which she is a part.

In *Travitzky v. Travitzky*, 230 Pa. Super. 435, 326 A.2d 883 (1974) the court expressly rejected the assertion that a new spouse had any obligation to support the children of the first marriage. Specifically, the court in *Travitzky* held:

"Should a parent remarry, as the appellee has in the instant case, there is nothing in our law which requires the new spouse to support minor children of the first marriage. We do not believe that such an extension of our support laws should be made. In addition, to consider the separate assets or earnings of a second wife as an element of her husband's 'financial resources' belies the concept in our law that married individuals retain their legal identity and may own separate property and estates." *Id.* at 439-40, 326 A.2d at 885. However, the court in *Travitzky* did state:

"Certainly, if the second wife was gainfully employed and if her earnings or a portion thereof was contributed to the family budget such facts would be relevant in determining the father's ability to pay for his minor children." *Id.* at 440, 326 A.2d at 885; accord: *Melzer* at 476, 480 A.2d at 998.

Put another way, if the second spouse is making contributions to the family budget, that fact is relevant in considering the parents' net expenses and, thus, their ability to pay support. Similarly, in *Commonwealth ex rel. Mainzer v. Audi*, 266 Pa. Super. 122, 403 A.2d 124 (1979), the court held that the trial court could properly consider the second spouse's "voluntary contributions" to the family budget in computing appellant mother's ability to pay child support although second spouse had no

duty to support children of his wife's first marriage and his separate assets and earnings could not be considered part of her financial resources. *Id.* at 124, 403 A.2d at 125, citing *Travitzky, supra.*

More recently in *Lampa v. Lampa,* 371 Pa. Super. 1, 537 A.2d 350 (1988), in affirming the trial court's decision not to include the income of husband's new spouse in calculating husband's disposable income that was available to him to pay child support, the court held:

"The law is clear that the court must be aware of such income and thus must consider that income in fashioning a child support obligation. *Melzer v. Witsberger,* 505 Pa. 462, 480 A.2d 992 (1984); *Shank v. Shank,* 298 Pa. Super. 459, 444 A.2d 1274 (1982). However, the spouse is under no obligation to support her husband's children from a previous marriage. '[W]hile her income is not available for support, its effect on the total financial status of the appellant cannot be ignored.' *Palmatier v. MacCartney,* 365 Pa. Super. 300, 305, 529 A.2d 518, 521 (1987). *Therefore, once her income has been considered, the court may, within its discretion, choose not to include that amount when calculating what funds are available for child support. Commonwealth ex rel. Travitzky v. Travitzky,* 230 Pa. Super. 435, 326 A.2d 883 (1974)." *Lampa, supra.* (emphasis supplied)

In the instant case, husband had been living with Dr. Greenacre only since March 29, 1987. She is a medical doctor at Temple University Hospital and has her own apartment in Philadelphia. The parties stipulated that she has the capacity to contribute to his household expenses to the extent required by law. However, she was not doing so at the time of the hearings, except for partial payments for food.

As of the time of the last hearing she had only lived with husband for four and one-half months, continued to maintain her own apartment in Philadelphia, did not know how long she would continue to live with husband and both considered their relationship to be fragile and in its nascency.

Based on the foregoing, it is clear that Dr. Greenacre is under no obligation to support husband's children from a previous marriage. Therefore, the court was correct in not including the income of Dr. Greenacre in calculating husband's income.

The court should and did, however, consider Dr. Greenacre's ability to contribute to the expenses of the household. After considering the uncontradicted evidence, the court found that she was not making any such contributions. In addition, in view of the fact that she had only been living with husband for a period of four and one-half months, she continued to maintain her own apartment in Philadelphia, she did not know how long the relationship would continue, and both she and husband considered their relationship to be fragile and in a nascent stage, the court concluded that it was not unreasonable for her not to be making such contributions to the household expenses at that point in their relationship. Thus, after reviewing the evidence, the court considered the ability of Dr. Greenacre to contribute to the household expenses, but concluded in its discretion not to include in computing husband's net household expenses the amount that Dr. Greenacre *might* have contributed to those expenses had she chosen to do so, in view of the then existing relationship between the parties. Should the relationship become more stable through the passage of time or any other of these factors change subsequently to the hearings conducted in this mat-

ter, wife can pursue her normal remedies through a petition to increase support.

Wife further points out that in contrast to the treatment of husband's paramour, the court did consider the contribution by her paramour to the expenses of the home occupied by wife and him. This is correct. However, the factual differences between the two relationships were substantial. Wife began living with David Sanderson on February 13, 1986, 18 months prior to the last hearing. Sanderson testified that wife and he agreed to share expenses equally including rent, utilities, phone, maid, furniture rental, food, entertainment, transportation and incidentals. However, since wife began receiving child support, they agreed that Sanderson would pay only one-third of the rent and one-third of the food during the times when the children were there. Sanderson further testified that he in fact had made the agreed-upon contributions to the household expenses.

Following the holdings of *Travitsky, Melzer* and *Lampa,* the court, acting within its discretion, could consider the voluntary contributions made by Sanderson to the home occupied by wife and him and the court did so because their relationship was substantially different from the relationship between husband and Dr. Greenacre. Sanderson in fact made the contributions whereas Dr. Greenacre did not. Sanderson's relationship with wife was one of several years' duration beginning long before they moved in together. Sanderson had no other home that he was maintaining and there was no indication that their relationship was other than stable and long-standing. Thus, the court acted appropriately in considering the contributions to the household expenses by Dr. Greenacre and Sanderson, but

not including potential contributions from Dr. Greenacre and including actual contributions by Sanderson.

### Application by Wife to Proceed Under the February 12, 1988 Amendments to the Divorce Code

The Pennsylvania Legislature amended section 401(e) of the Divorce Code by the Act of February 12, 1988, P.L. 66, §1, 23 P.S. §401(e). The amendment changed the statute to provide that the increase in value of inherited property would be included as marital property from the date of acquisition to the "date of separation" rather than "during the marriage." This was relevant in the instant proceeding because it would resolve that issue in connection with the Swampscott property in a manner favorable to wife who had inherited the property.

The hearings in this matter were concluded during the latter part of 1987. The decree nisi was issued on February 4, 1988. The amendment did not become effective until February 12, 1988. Wife then made an application under section 103 of the Divorce Code to proceed under the amendment as an attempt to limit the amount of the increase in value of her interest in the Swampscott property that would be included as marital property and thus subject to equitable distribution. After hearing and oral argument, the court denied the application and wife contends the court erred in this regard.

### Section 102 of the Divorce Code

*Gordon v. Gordon,* 293 Pa. Super. 491, 439 A.2d 683 (1981) set forth the standard by which the applicable law of a divorce case will be determined:

"[t]he decision whether 'an application [should be] granted' is to be made by reference to the objec-

tives described in section 102 of the code. If granting the application will further those objectives, the court should grant the application; if granting the application will be inconsistent with those objectives, the court should deny the application." *Id.* at 504, 439 A.2d at 690.

Under section 102, the court should determine whether or not the legislative objectives and intent as defined by section 102 would be furthered by granting the application. 23 P.S. § 102. The discretion of the court in evaluating such an application is limited to consideration of the legislative objectives and intent listed under section 102 of the Divorce Code. *Miller v. Miller,* 296 Pa. Super. 519, 442 A.2d 1172 (1982). Section 102 of the Divorce Code, entitled Legislative Findings and Intent, provides:

"(a) The family is the basic unit in society and the protection and preservation of the family is of paramount public concern. Therefore, it is hereby declared to be the policy of the Commonwealth of Pennsylvania to:

"(1) Make the law for legal dissolution of marriage effective for dealing with the realities of matrimonial experience.

"(2) Encourage and effect reconciliation and settlement of differences between spouses, especially where children are involved.

"(3) Give primary consideration to the welfare of the family rather than the vindication of private rights or the punishment of matrimonial wrongs.

(4) Mitigate the harm to the spouses and their children caused by the legal dissolution of the marriage.

"(5) Seek causes rather than symptoms of family disintegration and cooperate with and utilize the resources available to deal with family problems.

"(6) Effectuate economic justice between parties

who are divorced or separated and grant or withhold alimony according to the actual need and ability to pay of the parties and insure a fair and just determination and settlement of their property rights.

"(b) The objectives set forth in subsection (a) shall be considered in construing provisions of this act and shall be regarded as expressing the legislative intent." Act of April 2, 1980, P.L. 63, 23 Pa. C.S. §102.

In *Gordon*, the court analyzed an application to proceed under the new Divorce Code of 1980,[2] rather than the Divorce Law.[3] The action was commenced under the Divorce Law but was still pending on July 1, 1980 when the Divorce Code became effective. Defendant filed the application to proceed under the Divorce Code in order to seek remedies of equitable distribution and post-divorce alimony that did not exist under the Divorce Law. In determining whether to grant the application and proceed retroactively under the Divorce Code the *Gordon* court stated:

"The point to bear in mind is that the Divorce Code of 1980 represents a drastic, and dramatic, repudiation by the legislature of the philosophy of the Divorce Law of 1929." *Id.* at 506-7, 439 A.2d at 691.

The *Gordon* court further stated:

"In section 102 of the Divorce Code the legislature declared as the policy of the commonwealth a philosophy and set of objectives diametrically opposed to the punitive philosophy of the Divorce Law of 1929." *Id.*

The Superior Court in *Gordon*, considering the drastic legislative change from the Divorce Code,

---

2. Act of April 2, 1980, P.L. 63, 23 P:S. §101 et seq.

3. Act of May 2, 1929, P.L. 1237, as amended, 23 P.S. §1 et seq. (repealed).

found that granting the application would further the legislative objectives set forth in section 102 by dealing with the realities of matrimonial experience, 23 P.S. §102(a)(4), and effectuating economic justice, 23 P.S. §102(a)(6). As a result, the new law of the Divorce Code applied to the pending action, under the section 102 analysis, since the legislature clearly intended to repudiate the harsh Divorce Law by enacting the Divorce Code.

Unlike the change from the Divorce Law to the Divorce Code, the amendment herein involved does not create any fundamental change in the dissolution of the matrimonial unit. No new remedies are created by the amendment. The amendment does not affect the legislative interests of section 102 of the Divorce Code. Rather, the amendment merely amounts to a refinement of the Divorce Code.

Under the *Gordon* standard, the legislative objective and intent, listed in section 102, would not be furthered by granting wife's application to proceed under the February 12, 1988 amendments to the Divorce Code. As such, the application was denied.

### Section 103 of the Divorce Code

Second, wife's section 103 application to proceed under the 1988 Amendments to the Divorce Code is improper. The section 103 application procedure applied only to applications at the time of the original enactment of the Divorce Code and not to subsequent amendments thereto. 23 P.S. §103. The section 103 application procedure was designed to rectify the law in pending cases during the dramatic legislative changes in divorce law from the punitive philosophy of the Divorce Law to the Divorce Code. *Gordon v. Gordon,* 293 Pa. Super. 491, 439 A.2d 683. No such dramatic shift in legislative philosophy occurred in the enactment of the February 12,

1988 amendments to the Divorce Code which simply made minor refinements to the statutory language of the Divorce Code. The philosophy of the amendments is consistent with the Divorce Code philosophy set forth in section 102.

Under section 102 and section 103 of the Divorce Code, the court properly denied wife's application to proceed under the February 12, 1988 Amendments to the Divorce Code.

*Section 1953 of the Statutory Construction Act*

Having denied the application to proceed under the new amendments, the next question is whether the amendments should automatically apply. Section 1953 of the Statutory Construction Act indicates that the amendments should be applied prospectively only. It states that:

"Whenever a section or part of a statute is amended, the amendment shall be construed as merging into the original statute, become a part thereof, and replace the part amended, and the remainder of the original statute and the amendment shall be read together and viewed as one statute passed at one time; but the portions of the statute which were not altered by the amendment shall be construed as effective from the time of their original enactment, and the *new provisions shall be construed as effective only from the date when the amendment became effective.* Act of Dec. 6, 1972, P.L. 1339, §3, effective immediately. (emphasis supplied)

Thus, under section 1953, although an amendment to a statute is to be treated as merging into the original statute, it shall be construed as effective only from the date when the amendment became effective. *S.D. Richman Sons Inc. v. Commonwealth of Pennsylvania, Board of Finance and Review*, 53 Pa. Commw. 110, 416 A.2d 1161 (1980). Applying

these statutory requirements to this case, the amendments are to be applied prospectively only from their effective date of February 12, 1988. Since the pleadings were closed, all evidentiary hearings had been concluded, briefs submitted and oral arguments heard and the decree nisi was issued prior to the date the amendments became effective, the amendments do not apply to the case at bar.

It has been held, however, that statutory amendments which are procedural in nature rather than ones affecting vested rights should be applied to any litigation pending at the time of their enactment. See *In re Honey Bear Inc.*, 45 Pa.Commw. 185, 406 A.2d 814 (1979); *Universal Cyclops Steel Corp. v. Workmen's Compensation Appeal Board*, 9 Pa. Commw. 176, 305 A.2d 757 (1973). Thus a procedural statute may be applied to litigation instituted prior to its enactment but not yet completed.

The necessary corollary to this principle, however, is that legislation which affects rights will not be construed to be retroactive unless it is declared so in the act. *Kuca v. Lehigh Valley Coal Co.*, 268 Pa. 163, 110 Atl. 731 (1920). The statutory amendments in the instant case being ones which clearly affect the substantive rights of the parties, rather than being procedural matters, the amendments do not apply. In *Redevelopment Authority of City of Philadelphia v. Lieberman,* 461 Pa. 208, 336 A.2d 249 (1975), section 609 of the Eminent Domain Code, which permitted awards of business dislocation damages, was repealed by the legislature after the commencement of the condemnation action but prior to the conclusion of the trial. Thus, the statutory change occurred at an earlier stage of the proceedings than in the instant case because the change occurred there prior to the conclusion of the trial; whereas, in the instant case the statutory change occurred after

the conclusion of the trial and the rendering of the court's decision. The court in that case ruled that the condemnee was entitled to proceed under the prior act and was entitled to seek business dislocation damages.

Finally, the court notes that section 1926 of the Statutory Construction Act provides as follows:

"No statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly." 1 Pa. C.S. §1926.

This court perceives no such clear and manifest intent expressed in the act here in question. Therefore, it will not give retroactive effect to the amendments. *Misitis v. Steel City Piping Company,* 441 Pa. 339, 272 A.2d 883 (1971); *Commonwealth v. Story,* 497 Pa. 273, 440 A.2d 488 (1981).

## *Personal Property Distribution*

Wife contends that the lower court erred in its distribution of personal property. Wife argues that the lower court mistakenly noted in its June 28, 1988 order that wife agreed to the distribution of the personality as set forth in paragraph no. 21 of the decree nisi with the exception of one ceramic lamp. Wife contends that no such agreement took place at oral argument.

In his memorandum, husband accepted wife's valuation of all of the personalty and suggested a division of the personalty which allocated $9,135 of the personalty to husband and $17,695 of the personalty to wife. Wife was given an opportunity to respond to this suggested division and did not do so. In paragraph no. 21 of the decree nisi the lower court accepted the proposed distribution of the personalty as a reasonable and equitable division of the personalty.

At oral argument on the exceptions, both attorneys and their clients appeared. During the course of the oral argument counsel for wife and wife agreed that they would accept the determination with reference to the personal property except for one ceramic lamp. Husband agreed to give that ceramic lamp to wife. The lower court then incorporated this agreement in paragraph 4 of the final decree issued June 28, 1988.

In her statement of matters complained of on appeal wife now alleges that no such agreement took place. Since the testimony of this oral agreement was not recorded, the court relied on its own recollection and notes to show that the agreement did indeed take place.

In addition, the court notes that pursuant to the agreement at oral argument, no oral argument was presented by wife with reference to the division of the personalty. Moreover, wife's brief only summarily dealt with the issue of personalty division. To preserve an issue for review, a party must both make a timely specific objection and argue the alleged error on a post-trial motion. *Commonwealth v. Hughes,* 268 Pa. Super. 536, 408 A.2d 1132 (1979).

As stated in *DiSalle v. P. G. Publishing Company,* 375 Pa. Super. 510, 544 A.2d 1345 (1988):

"Post-trial practice is governed by Pa. R.C.P. 227.1 which requires timely objection and specific mention in a post-trial motion before an issue may be considered by the post-trial court. Pa. R.C.P. 227.1(b). The purpose for this rule is to afford the trial court the opportunity to correct an error at the time it is made, and to inform the court of the issues which must be decided at the post-trial stage, *Id.*; Explanatory Comment — 1983, thereby giving it the first opportunity 'to review and reconsider the determination it made at trial.' *Weir by Gasper v.*

*Ciao,* 364 Pa. Super. 490, 494, 528 A.2d 616, 618 (1987).

"To fully effectuate the latter purpose, common sense mandates that any issue raised in the motion for post-trial relief must also be briefed and argued to the trial court. Thus, this court, after stating the requirements of rule 227.1(b), went on to note that, '[m]oreover, failure to set forth an argument in briefs filed in the court in support of post-trial motions constitutes a failure to preserve the issue or issues not argued.' " *DiSalle, supra.*

See also *Scarborough v. Lewis,* 359 Pa. Super. 57, 518 A.2d 563 (1986) wherein the court noted that:

"In our view, the city's failure to brief the critical duty issue at the close of the proceedings deprived the trial court of both the need and opportunity to address the merits of the city's post-trial contentions in this regard. Thus, we conclude that the common law duty issues, as raised now by the city on appeal, are waived and may not serve as a basis for relief." *Id.* at 62, 518 A.2d at 566.

Similarly, in *Commonwealth v. Burchard,* 349 Pa. Super. 456, 503 A.2d 936 (1986), the court noted that issues must be preserved at each and every stage of review; otherwise, they are deemed waived and cannot subsequently be raised on appeal.

Since wife neither briefed with specificity nor argued the issue of the distribution of personalty agreement, the issue is deemed waived on appeal.

*Swampscott Property:*
*Increase in Value of Swampscott Property as "Marital Property"*

Wife next contends that the court erred in treating any increase in value of the Swampscott property as "marital property."

"Marital property" is defined under the Divorce Code of 1980, Act of April 2, 1980, P.L. 63, 23 P.S. §401. Pursuant to section 401(f) of the Divorce Code, [a] "property, whether real or personal, acquired by either party during the marriage is presumed to be marital property, regardless of whether title is held individually or by the parties in some form of co-ownership." The exceptions to inclusion as marital property are set forth in section 401(e). Excluded from the definition of marital property is property received during the parties' marriage either in exchange for premarital property or by gift, bequest, devise or descent. However, any increase in value of such exchanged given property during the marriage is considered marital property. 23 P.S. §401(e)(1) and (3).

Wife's mother, Deborah W. Cutler, died on November 18, 1982, owning a home located at 39 Lincoln Court, Swampscott, Massachusetts. Deborah W. Cutler's will provided:

"(1) If my husband, Joseph G. Cutler, shall survive my decease, I give to him a life estate for and during his life following my decease in my residence parcel of land and buildings commonly numbered 39 Lincoln House Point in Swampscott including the payment to and retention by him of rental income if any, all provided that he shall pay and discharge all the expenses of maintaining and insuring the said premises and including the payment of municipal real estate taxes thereon which may accrue or become payable during his lifetime; and upon his decease the remainder interest to our daughters Constance C. Goodman and Elizabeth Ann Cutler as tenants in common, or if one be then deceased to the survivor of them."

Deborah W. Cutler's will gave a life estate to her husband, Joseph G. Cutler, and the remainder to wife and wife's sister as tenants in common.

Wife argues that the increase in value of her interest in the Swampscott property does not constitute marital property for purposes of equitable distribution because she has no possessory interest in the property.

The Superior Court has repeatedly held that unmatured pensions are property subject to the regular rules of marital property in equitable distribution. *King v. King,* 332 Pa. Super. 526, 481 A.2d 913 (1984); *Flynn v. Flynn,* 341 Pa. Super. 76, 491 A.2d 156 (1985); *LaBuda v. LaBuda,* 349 Pa. Super. 524, 503 A.2d 971 (1986). Thus, one need not have a right to possess pension benefits in order for them to be considered marital property.

In *Diamond v. Diamond,* 360 Pa. Super. 101, 519 A.2d 1012 (1987) the court stated:

"It matters not when a spouse received property, but whether the right to receive such property accrues during the marriage. To the extent that a property right accrues or arises during the marriage, then the spouses expect they will enjoy the property when they receive it." *Id.* at 109, 519 A.2d at 1016, citing *LaBuda v. LaBuda,* 349 Pa. Super. 524, 533, 503 A.2d 971, 976 (1986) (lump-sum retirement payment accrued prior to separation but received after separation properly included as marital asset.) *Id.* at 109, 519 A.2d at 1016.

In this case, wife's right to receive the Swampscott real estate arose during the marriage, upon the death of her mother on November 18, 1982. The increase in value of wife's property right in Swampscott is presumptively marital property. 23 P.S. §401(f). Wife's remainder interest in real estate is a vested property right which was acquired dur-

ing the course of the marriage. It should be included in marital property in the same manner as a vested pension which will not achieve payable status for a number of years is considered marital property.

Wife next argues that wife's interest in Swampscott cannot be valued and therefore is not marital property. *Hutnik v. Hutnik,* 369 Pa. Super. 263, 521 A.2d 151 (1987). However, the Swampscott property can be and has been valued for purposes of distribution as marital property. The facts of *Hutnik* involved a mere expectancy, not a property right. Specifically, the facts concerned a certificate of deposit held jointly by husband and his mother. The court found that the certificate of deposit belonged to the mother. Thus, the mother had the right and authority to dissipate or expend the funds in any way she saw fit. Husband, therefore, would have no right to the funds until his mother's death at which time there may be no funds remaining.

In contrast, the facts of the case at bar show a traditional real estate interest, a remainder interest subject to a life estate. Unlike the mother and the certificate of deposit in *Hutnik,* a life tenant in real property cannot dissipate or expend the property. Wife's interest in the Swampscott property is subject only to the life expectancy of her father, the life tenant. Since life expectancies are regularly and precisely calculated, wife's interest in the Swampscott property is capable of valuation and should be included as marital property for purposes of equitable distribution.

### Date of Valuation of Increase in Value of Inheritance

Having determined that the Swampscott real estate is marital property, the next issue is the date

of valuation. Wife argues that the increase in value of the Swampscott property should be cut off as of the date of separation, June 1984, rather than the date of the hearing.

Section 401(e) (3) speaks of "increase in value during the marriage." 23 P.S. §401(e) (3). As a result, the court included the increase in value from the date of acquisition to the date of the hearing. Following the language of section 401(e) (3), since the parties were still married as of the date of the hearing, the increase in value to that date was required. Inclusion of increase in value to the date of the hearing is supported by *Winters v. Winters,* 355 Pa. Super. 64, 512 A.2d 1211 (1986) wherein the Superior Court approved the evaluation of trust assets to the date of the equitable distribution hearing, rather than the date of separation. The *Winters* court determined the increase in value of the inheritance by taking the initial value of the inheritance and comparing it to the value of the inheritance at the time of the equitable distribution hearing.

Even if the language of the Divorce Code did not specifically mandate the use of the hearing date as the cutoff for valuation of an increase in value during the marriage, the *Winters* court determined that "it is appropriate for the trial court to select the date which best serves to provide for economic justice between the parties. See 23 P.S. §102(a)." *Id.* at 69, 512 A.2d at 1214. In the rationale for permitting the court discretion in its choice of valuation dates, the Superior Court stated:

"To recognize a specific valuation date as a matter of law would deprive the trial court of the necessary discretion required to effectuate economic justice." *Id.* at 69, 512 A.2d at 1214, citing *Sergi v. Sergi,* 351 Pa. Super. 588, 593, 506 A.2d 928, 932 (1986).

The court determined that the increase in value from the date of separation to the date of the hearing was due to inflationary and market factors and not the efforts of the parties. Since the post-separation increase in value was not the result of the actions of either of the parties, the value as of the date of the hearing produces a more equitable result. *Winters v. Winters,* 355 Pa. Super. 64, 512 A.2d 1211 (1986).

The Superior Court has determined that distribution of marital property is within the sound discretion of the hearing court and will not be disturbed in the absence of a clear abuse of discretion. *Buckl v. Buckl,* 373 Pa. Super. 521, 542 A.2d 65 (1988); *Ruth v. Ruth,* 316 Pa. Super. 282, 462 A.2d 1351 (1983). The scope of review of an order of equitable distribution has been determined to permit reversal only upon a showing of abuse of discretion. *Winters, supra; Sergi v. Sergi,* 351 Pa. Super. 588, 506 A.2d 928 (1986).

The court acted properly in choosing the valuation date which complies with the specific language of the statute and which better effectuates economic justice. Further, in weighing expert appraisals of the value of the Swampscott property as of the hearing date that were provided by each party, the court properly applied the principles of section 401(d) of the Divorce Code to arrive at the value of the increase in value in paragraph no. 7 of the decree nisi. After review, the court gave wife 75 percent of this increase in value, rather than 55 percent as with the other marital assets, because of her unique relationship with her father which resulted in her obtaining the property. The court properly considered the elements of section 401(d) of

the Divorce Code in distributing marital property and did not abuse its discretion.[4]

On the basis of the aforesaid, it is submitted that the final decree and order of June 28, 1988 should be affirmed.

---

4. Even if the court chose to cut off the portion of the Swampscott property considered to be a marital asset as of the date of separation, rather than the date of the hearing, the practical result to the parties would not be substantially different. The court would still consider as a marital asset the increase in value of wife's portion of the Swampscott property from the date of inheritance to the date of separation. Then the court would go on to consider whether that increase in value should be valued as of the date of separation or as of the date of the hearing. Since the value represents a proportionate share of the Swampscott real estate, and the value of that proportionate share continued to increase from the date of the separation to the date of the hearing through market forces and inflation rather than through the efforts of either of the parties, the court would then choose to value that proportionate share of the Swampscott property as of the date of the hearing rather than the date of separation. As a result, the final value included for distribution purposes would be substantially the same as that which the court determined in its final decree.